Argued and submitted April 7, affirmed July 15, 1998

Yolanda BLUME,
*Respondent,*
*v.*
FRED MEYER, INC.,
a Delaware corporation,
*Appellant.*
(9509-06204; CA A95765)
963 P2d 700

Charles F. Adams argued the cause for appellant. With him on the opening brief was Stoel Rives LLP; with him on the reply brief were Keith M. Garza and Stoel Rives LLP.

Mark G. McDougal, Jackson, Mississippi, and Gregory Kafoury argued the cause for respondent. On the brief was Gregory Kafoury.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

Plaintiff brought this action for false arrest and malicious prosecution, alleging that she was unlawfully arrested pursuant to defendant Fred Meyer's policy of randomly checking for receipts. The jury returned a verdict in favor of plaintiff awarding her compensatory damages of $25,000 and punitive damages of $450,000. Defendant appeals. We affirm.

Plaintiff's claim arose from an encounter at about 6:30 p.m. on May 22, 1995, at the Hollywood West Fred Meyer store in Northeast Portland. At the time of the incident, plaintiff, an African-American, was 26, and lived in Portland with her mother. She had been educated at Howard University and was employed at Hewlett-Packard as a software engineer. At the store, plaintiff had made two separate purchases at the deli: pork fried rice for $1.32, and chicken strips and pasta for $4.19. The two sales were handled by different clerks, and the items were put into two separate plastic containers, each in its own lunch-sized brown paper bag. Neither clerk gave plaintiff a receipt for her purchases.

Plaintiff left the deli and passed through the first set of store exit doors, the "courtesy exit" located next to checkstand No. 1. There was testimony that the checker at that checkstand had "a special duty" regarding the courtesy exit, which included stopping people to ask if they have receipts. As plaintiff walked through the foyer, she heard a man yelling, "Miss, Miss." Plaintiff was one of a number of people in the foyer and did not think that the call was directed toward her. She heard the yell again, turned, and was confronted by a uniformed clerk, Len McKeever, who plaintiff testified was "directly in front of me." McKeever put his face "six inches away" from plaintiff's and said in a "very loud" voice, "Let me see your receipts." Plaintiff asked why she was being stopped. McKeever did not respond to her question but instead demanded again, "Let me see your receipts." Plaintiff testified that she felt that McKeever was saying "do what I say," that she did not think that she could walk away "with nothing happening," and that she did not believe that she "was free to leave."

Plaintiff was "quite insistent she paid," but, unaware that she did not have receipts, she began rummaging through her bags looking for the receipts. When she could not find them, McKeever "took" the bags from her and searched them. Plaintiff testified that she was "very humiliated" because they were in a "very busy area and people were walking through looking while this man is searching my bag." She was "afraid" she would be handcuffed. She offered McKeever a bunch of receipts she found in her purse, but they were not from Fred Meyer. McKeever became "more aggressive" and "was hostile and rude." McKeever summoned another clerk, Holverson, and asked Holverson to "escort" plaintiff to the deli to see why she did not have receipts. Holverson testified that he asked plaintiff to accompany him to the deli so "we could get this matter taken care of and then she could be on her way." At the deli, Holverson, who plaintiff testified was "very nonchalant," asked the clerks whether plaintiff had paid for the items. Plaintiff testified that she was "really concerned" because the deli was busy, and she did not know if the clerks would remember her. She testified that she felt "like a criminal" because "people had seen what happened and here was a man escorting me with a red jacket on[.]" The two clerks confirmed that plaintiff had paid but that they had not given her a receipt. One explained that the register had run out of tape. Plaintiff testified that "approximately 10 minutes" elapsed from the time McKeever stopped her until the situation was resolved at the deli.

Plaintiff testified that, when she asked Holverson why she had been stopped, he replied that Fred Meyer "occasionally stop[s] people to check for receipts," and then he walked away. McKeever gave no answer to plaintiff's inquiry as to why she was stopped. McKeever testified that he was told by a customer in his checkstand line that plaintiff had not paid for her goods, but he could not remember what the customer looked like other than that she was a "white female." McKeever did not tell Holverson that a customer had pointed to plaintiff.

Plaintiff was infuriated by her treatment and went to customer service and asked to speak to the store manager. She was told that no one was on duty but that she could write a complaint. No formal complaint form was available, so the

customer service clerk gave plaintiff a piece of paper. Plaintiff wanted to name the employees who had stopped her and returned to McKeever's check stand, where there were customers in line. Plaintiff got the name "Len" from his name tag but, wanting his last name, she returned to ask the clerk at customer service. The clerk directed plaintiff to the person-in-charge stand where a clerk told plaintiff that she could not give out employees' last names but that she would try to find out why plaintiff was stopped. The clerk "turned her back" on plaintiff and called McKeever. Plaintiff could not hear the exchange but, when the clerk turned back to plaintiff, the clerk's attitude, according to plaintiff's testimony, was "we've told you something * * * why do you keep bothering me with these questions." The clerk told her that McKeever had said that someone came and told him that plaintiff did not pay. The clerk then "walked off, just dismissed [plaintiff] too." Plaintiff was upset with the employees' attitudes and felt that she was not getting assistance.

Plaintiff returned to the service desk where she found her sister who had been waiting in the car. The sister called their aunt who suggested that plaintiff get hand-written receipts as proof of purchase and talk to someone in security. Plaintiff returned to the deli. One clerk wrote her a receipt. While waiting for the second clerk to return from lunch, plaintiff spoke with Jackson, one of defendant's security personnel, who told plaintiff that "[s]omeone from security should have been involved if they suspected that [plaintiff] was stealing" but that plaintiff should talk to the store director as he could give a better explanation. Jackson testified that plaintiff was "upset." Plaintiff wrote her complaint and gave it to the customer service clerk. The clerk testified that she photocopied the report and put the original in the director's folder and that the director pulled the file "every day." The clerk told plaintiff that the director, Prochovnic, would get the complaint the following day and would call her with an explanation. Prochovnic never contacted plaintiff. Before leaving the store, plaintiff returned to the deli, and the second clerk picked up "off the floor" the receipt that she had earlier rung up for plaintiff. The events after Holverson left plaintiff took 15 to 20 minutes.

At home, plaintiff cried for two to three hours. She discussed the event with her mother, who testified that plaintiff had said that "they had accused her of stealing" and that she was "never going in that store again." Her mother suggested that plaintiff talk with a lawyer and that plaintiff "should go to a movie that night and try to forget about it." Plaintiff went to a movie and, when she returned, woke her mother and said that they would talk to a lawyer in the morning.

Plaintiff testified that she was "upset because of the lack of assistance and just being treated so rudely because I spend so much money at Fred Meyer." At a minimum, she had hoped for an apology. In her deposition, which was read at trial, plaintiff testified that she was now "leery" in stores and always made sure that she had a receipt. Plaintiff's mother testified that later plaintiff told her that the incident had made her feel that she wanted to return to Washington, D.C., where she had gone to school because "if she hadn't been a black woman," she would not have been stopped. Plaintiff did not so testify, but testified that the incident was the deciding factor in her decision to move to Atlanta 15 months later.

Plaintiff presented evidence to support her theory that defendant has an unwritten policy that allows nonsecurity employees to stop and detain customers at will and at random. Gonzales, one of the deli clerks, acknowledged that anybody who leaves other than through the cash register line might be stopped and asked to show a receipt. She testified that, if a person who was stopped did not have a receipt, you "ask them where they purchased the product, then you take them to the place where they either purchased it or take them to the closest phone and then you call that area to verify it." When asked if security is called if the customer didn't want to go, she responded that "[y]ou're supposed" to call security, but that you did not force the customer to go.

Desilets, the second deli clerk, testified that, if someone is stopped and asked for a receipt and says you have no cause to stop me, the clerk is supposed to call security. Asked, "Is it or is it not a fact that [defendant has] a policy which

allows people to be stopped and receipts demanded at random?", Holverson testified, "Yeah, I guess. I mean, I'm not sure of the exact policy word-for-word, but yeah, from what I understand you can stop somebody to see if they have a receipt." Holverson admitted that such stops were "random." He testified that the policy was for "the customer's security is what it is so the customer can get out with their items." Prochovnic was equivocal about whether there was a store policy of random stops for receipts but testified that not all store policies were written. He testified that it was important that the store "make sure the customer gets a receipt in case they want to exchange up the road." Jackson testified that non-security personnel were authorized to stop people at random to check for receipts as "customer service[,] not arresting people." She testified that the security personnel were "versed" on probable cause and stopped people who were seen stealing. All witnesses who testified on the subject stated that, if a customer did not display a receipt or just kept moving, a non-security employee was not authorized to physically detain the customer. Jackson also testified that security personnel would also not be authorized to use reasonable force to detain someone who did not want to show a receipt.

The jury was instructed:

> "If you find that a customer of the store informed [defendant's] personnel that the plaintiff did not pay for her merchandise, I instruct you that there was probable cause to detain the plaintiff. If you find that the plaintiff was detained as part of a policy to randomly stop customers, I instruct you that there was not probable cause to detain the plaintiff."

Defendant first assigns error to the denial of its motion *in limine* to exclude from trial any evidence on the issue of race on the grounds that it was irrelevant and unfairly prejudicial. We review whether evidence is relevant as a question of law and a court's determination of whether the probative value of relevant evidence is outweighed by a danger of unfair prejudice for abuse of discretion. *Fugate v. Safeway Stores, Inc.*, 135 Or App 168, 173, 897 P2d 328 (1995). Defendant argues that plaintiff's counsel planted the race issue in the jury's mind by his remarks in his opening statement that "this is not a race case" and that plaintiff

thought, "what if they think all black people look alike." Defendant contends that plaintiff did not, however, so testify and that the only testimony about race offered by plaintiff was from her mother, who testified that her daughter was in distress because she felt that she had been singled out for racial reasons. Thus, defendant contends, events at trial showed that references to race were indeed irrelevant.

Plaintiff argues that her feeling, as expressed to her mother, that if she "hadn't been a black woman she didn't think she would have been stopped," was admissible on the issue of damages. Therefore, she contends, race was relevant to the issue of damages, and there was no error in the court's denial of defendant's motion, which was to exclude *all evidence* of race.

As the trial court recognized, defendant's motion to exclude all evidence of race was implausible:

> "The plaintiff is black. She's African-American. That in and of itself raises the race issue, unless I'm going to exclude her from the courtroom which obviously would be absurd. So, the issue is there, and I think I noted that right up front, that I could not exclude any references to race, particularly given the issue of damages in a case such as this."

Moreover, the effect of defendant's policy on plaintiff, *i.e.*, that she may have felt that defendant acted from a racial motive, was not irrelevant. Defendant contends, however, that, even if race were relevant to damages, allowing "open-ended use" was an abuse of discretion because any relevance was substantially outweighed by the potential for unfair prejudice. Defendant points to the opening statements of plaintiff's counsel and to several of counsel's statements at trial in support of its position that the ruling "opened the door for plaintiff's counsel to invite the jury to find a racist motive." However, in ruling on defendant's motion for a new trial on the ground of racial injection, the trial court specifically noted that plaintiff's counsel had not taken advantage of the pretrial ruling:

> "[T]hroughout the trial [plaintiff's counsel] did not take advantage of my ruling in that he made it very clear to the jury that this was not—that he did not view this as a race case and they should not base their finding upon race, but

rather they should—they could consider that in the context of the plaintiff's testimony as to her damages."

The gravamen of defendant's position is its argument that the trial court's denial of the pretrial motion placed defendant in the "impossible circumstance" of having to counter counsel's opening remarks by affirmatively demonstrating the absence of any racial animus on defendant's part; that is, defendant was forced to question *its* witnesses about their own and the store's racial attitudes. However, defendant's tactical choice of how to address the racial issue at trial does not persuade us that the court erred in denying defendant's motion.

■   Defendant's remaining assignments of error challenge the punitive damage award. Defendant moved to declare the punitive damages award excessive and to vacate it or, alternatively, to reduce it. Defendant first argues that the award was so excessive that it can only be the product of prejudice and passion and must be set aside. The gist of defendant's position is that statements at trial, primarily those made by plaintiff's counsel, suggest that the jury made the award because of racial animus, local and anti-corporate prejudice, or because the jury "personalized" the matter. As defendant acknowledges, however, review of a punitive damage award for passion and prejudice and for violation of due process are "points along a single continuum." As we discuss below, we conclude that the punitive damage award is not unconstitutionally excessive. Defendant's speculations as to the jury's reasoning for the award do not show us that passion and prejudice, rather than the evidence before the jury, were responsible for its award.

We turn to defendant's argument that the punitive damage award was excessive under federal due process requirements. In *Honda Motor Co., Ltd. v. Oberg*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994) (*Oberg* (federal)), the United States Supreme Court held that the Due Process Clause requires judicial review of punitive damages awards. The court, however, did not identify what standard of review is constitutionally required. 129 L Ed 2d at 350 n 10. On remand, the Oregon Supreme Court held that

"the standard for post-verdict judicial review of an award of punitive damages is as follows: A jury's award of punitive damages shall not be disturbed when it is within the range that a rational juror would be entitled to award in the light of the record as a whole; the range that a rational juror would be entitled to award depends, in turn, on the statutory and common law factors that allow an award of punitive damages for the specific kind of claim at issue." *Oberg v. Honda Motor Co.*, 320 Or 544, 549, 888 P2d 8 (1995), *cert den* 517 US 519, 134 L Ed 2d 948 (1996) (*Oberg* (state)) (footnote omitted).

After *Oberg* (state), the United States Supreme Court addressed the standard to identify unconstitutionally excessive awards in *BMW of North America v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996). Defendant argues that Oregon's "rational juror" standard of review is no longer viable in the light of *BMW* and that the trial court here failed to provide the independent evaluation compelled by federal due process. Defendant argues:

"The U. S. Supreme Court adopted in *BMW* a federal standard that differs materially from the 'rational juror' standard developed in the interim by Oregon upon remand in *Oberg* (State). The Oregon Supreme Court adopted its 'rational juror' standard by framing the constitutional question to be whether a rational nexus exists between the evidence and the amount the jury awarded. *Oberg* (State), 320 Or at 551. This assigns to the reviewing court a role resembling that traditionally performed in directed verdict proceedings. *BMW* establishes, however, that the role of the court and the ultimate constitutional question bear no resemblance at all to such proceedings. Instead, a reviewing court must first decide for itself from the record what amount is 'reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence.' *BMW*, [134 L Ed 2d at 822]. The court must do this independently, employing the factors adduced in *BMW*. After doing so, the court then determines whether the *state*, acting *through* the jury, has awarded an amount that is 'grossly excessive' in relation to [those] interests.' *Id*." (Emphasis defendant's.)

In *BMW*, the plaintiff had purchased a new BMW, which had been refinished because acid rain had damaged the car's paint finish during transit. *BMW of North America,*

*Inc. v. Gore*, 646 So 2d 619, 621 (Ala 1994). BMW did not disclose the repainting to the plaintiff. On the plaintiff's action for suppression of a material fact, the jury awarded the plaintiff compensatory damages of $4,000 and punitive damages of $4 million. *Id.* at 622. On appeal, the Alabama Supreme Court applied post-trial procedures that had been tacitly approved in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 US 1, 22, 111 S Ct 1032, 113 L Ed 2d 1 (1991), to the punitive damage award and found BMW's conduct reprehensible. However, it reduced the award to $2 million because it found that the jury improperly computed the punitive award by multiplying the compensatory damages by sales in other jurisdictions. *BMW*, 134 L Ed 2d at 821.

The United States Supreme Court, however, rejected the "conclusion of the Alabama Supreme Court that BMW's conduct was sufficiently egregious to justify a punitive sanction that is tantamount to a severe criminal penalty." *BMW*, 134 L Ed 2d at 832. The Court remanded the case for the state court to determine whether the appropriate remedy required a new trial or independent determination of the award by the court. *Id.*, 134 L Ed 2d at 833. In so holding, the Supreme Court reaffirmed the right of a state to impose punitive damages to further the state's interest in punishing unlawful conduct and deterring its repetition. *Id.*, 134 L Ed 2d at 822. However, the scope of that interest must be properly limited. *Id.*, 134 L Ed 2d at 825. Underlying the inquiry as to whether an award is excessive are the "[e]lementary notions of fairness enshrined in our constitutional jurisprudence [that] dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a state may impose." *Id.*, 134 L Ed 2d at 826.

■ Three "guideposts" assist in reviewing whether a punitive award has crossed constitutional boundaries: (1) the degree of reprehensibility of the conduct; (2) the disparity between the harm or potential harm suffered and the punitive damage award; and (3) the difference between the award and the civil or criminal penalties authorized or imposed in comparable cases. *Id.*, 134 L Ed 2d at 826. Those guideposts are grounded on accepted legal principles: Thus, conduct that

is more blameworthy will be subject to a more severe penalty, *see id.* ("some wrongs are more blameworthy than others"); a penalty should bear a reasonable relationship to the actual harm, *id.*, 134 L Ed 2d at 829; the remedy should be what is needed to accomplish the goals of deterrence and punishment, *id.*, 134 L Ed 2d at 832.

The guideposts are "considerations," *id.*, 134 L Ed 2d at 826, and are not exclusive. *See id.*, 134 L Ed 2d at 831 (rejecting categorical approach). However, any considerations made on review must be grounded on accepted principles. *See id.*, 134 L Ed 2d at 839 (Breyer, J., concurring) (clear legal principles or fairly obvious historical or community-based standards are needed to significantly constrain punitive awards).

■   The *BMW* "guideposts" thus relate to statutory and common-law factors. So does the standard of review articulated in *Oberg* (state), 320 Or at 551 (range of punitive damages jury is entitled to award depends on statutory and common-law factors on which the jury is instructed and permitted to consider). Although jury instructions and considerations may, in fact, properly constrain a jury's consideration of punitive damages, we agree with defendant that a reviewing court's determination of whether the punitive damage award is unconstitutionally excessive is not dependent on instructions to the jury or on the jury's considerations.[1] Under *BMW*, although the reviewing court accepts the facts and inferences as the jury found them, evaluating whether a punitive damage award is excessive requires examination of, but not deference to, the jury's award. However, we do not agree with defendant, that the reviewing court independently determines the amount of an award that will vindicate the state's interests. Rather, the reviewing court's assessment is of the jury's award. *See BMW*, 134 L Ed 2d at 833 (application of guideposts to facts; determination that award was excessive; remanded for determination of remedy); *see*

---

[1] That point is evident from the guideposts. It is also made by dissenting Justice Scalia. *See BMW of North America v. Gore*, 517 US 559, 134 L Ed 2d 809, 843 (1996) (Scalia, J., dissenting) (if state interests are the "most fundamental determinant of an award, one would think that due process would require the assessing jury to be *instructed* about them") (emphasis in original).

*also Lee v. Edwards*, 101 F3d 805 (2d Cir 1996) (application of guideposts to facts in record; determination that award was excessive).

■ Here, the trial court used *Oberg* (state) language in its ruling but addressed factors of the *BMW* analysis. Defendant argues, however, that the trial court applied the *BMW* standards in an erroneous way by giving deference to the jury. Even assuming that defendant is correct, from *BMW*, it is apparent that the appellate court conducts an independent assessment of the punitive award. *See also Oberg* (state), 320 Or at 552 (appellate court is in as good a position as trial court to apply legal standard to the evidence). Our review under the *BMW* guideposts does not show that the trial court erred in denying defendant's motion to reduce the punitive damage award.

■ The starting point in the federal excessiveness inquiry is identification of the state's interests that a punitive damage award is designed to serve. *BMW*, 134 L Ed 2d at 822. Oregon's interest here is the protection of a person's fundamental right to personal liberty. *See Lukas v. J. C. Penney Co.*, 233 Or 345, 353, 378 P2d 717 (1963) ("False imprisonment is the imposition of unlawful restraint upon another's freedom of movement."). ORS 131.655(1) gives a merchant the right to interfere with a person's freedom only if there is "probable cause for believing that a person has committed theft of property of a store[.]"[2]

■ Under the Due Process Clause, notice of prohibited conduct is satisfied by prior statutory or common law. *See TXO Production Corp. v. Alliance Resources Corp.*, 509 US 443, 465-66, 113 S Ct 2711, 125 L Ed 2d 366 (1993) ("[T]he notice component of the Due Process Clause is satisfied if prior law fairly indicated that a punitive damages award might be imposed in response to egregiously tortious conduct."). There is no question here that defendant had notice that its right to interfere with a person's freedom must be based on probable cause. Furthermore, the jury's verdict for plaintiff shows that defendant detained plaintiff, not on the

---

[2] Probable cause is a defense to a subsequent civil action against the merchant. ORS 131.655(2).

basis of probable cause, but because of a policy to stop persons randomly to look for receipts. In short, there is no question as to "whether [defendant's] conduct is acceptable or unacceptable; the jury's finding of liability has already settled that question." *Lee*, 101 F3d at 809.[3]

We turn to the first *BMW* guidepost—the reprehensibility of defendant's conduct, "perhaps the most important" factor in assessing the punitive damage award. 134 L Ed 2d at 826. The focus of our analysis is properly on the enormity of defendant's offense, *id.*, for which the Supreme Court has identified three aggravating factors "associated with particularly reprehensible conduct," *id.*, 134 L Ed 2d at 827: (1) whether a defendant's conduct was violent or threatened violence; (2) whether a defendant acted with trickery or deceit as opposed to mere negligence; and (3) whether a defendant has engaged in repeated instances of misconduct. *Id.*, 134 L Ed 2d at 827-29; *see Lee*, 101 F3d at 809.

Neither defendant nor plaintiff contends that there was evidence of overt violence here. Defendant argues that an inference of a potential for violence from asking for receipts "cannot reasonably be drawn from the record as a whole." We do not agree. The jury could find that implicit in the employees' conduct was that plaintiff would be physically restrained if she did not do as she was told: McKeever aggressively stopped plaintiff, asked Holverson to "escort" her to the deli, and Holverson told plaintiff to go with him to the deli so they "could get this matter taken care of and *then* she could be on her way." (Emphasis supplied.) Although defendant presented evidence that no employee was supposed to physically restrain a shopper, the employee's actions conveyed the opposite impression. The employees did not make requests; they demanded and acted aggressively. Their conduct threatened physical restraint.[4]

---

[3] Thus, the jury rejected—as do we on appeal—defendant's position that the evidence does not support a finding that defendant had a policy of detaining people at random.

[4] Plaintiff's testimony was that the area was "very busy," and "people had seen what happened and here was a man escorting me." The coercive atmosphere created by the employees thus also included the potential for interference by other shoppers if plaintiff did not comply.

Moreover, consideration of the second and third aggravating factors shows that defendant's conduct was not a single act of "mere negligence." The jury found that plaintiff was stopped because of defendant's policy. The policy was unwritten. Thus, the inference is that defendant recognized the unlawful nature of its policy and tried to keep that policy vague and hidden. Additionally, the employees' familiarity with the store's policy of random stops and how to handle them shows that what happened to plaintiff was not an isolated incident.

Adding to the reprehensibility of defendant's conduct here is the evidence showing that defendant's policy was followed even in the face of the employees' awareness that most people would not be able to produce a receipt. Defendant's employees were instructed that they were supposed to give receipts, yet the testimony was that "most" people left without taking a receipt. Here, plaintiff did not receive a receipt because the cash register had run out of tape, the employee was unfamiliar with the register, and plaintiff did not want to wait. The employees thus let plaintiff leave without proof of purchase even though they knew there was a store policy to randomly stop customers to ask for that proof. The testimony also showed the difficulty a shopper could have in verifying a purchase. Desilets at first testified that she did not wait on plaintiff, that plaintiff had only one bag, and that the receipt was a duplicate of the receipt that Gonzales gave plaintiff. When faced with the fact that the receipts were for different items, she conceded that she was in error.

In effect, defendant's own practices set up the potential for what did, in fact, occur: an innocent person would be detained without probable cause and be required to establish that the stop was, in fact, not warranted. Thus, defendant's choice to authorize random stops affected not just plaintiff; it had the potential to affect any person at any time in defendant's store. Moreover, although the incident involving plaintiff may have resolved itself in 10 minutes, the potential for harm could go well beyond that period of time for a shopper who could not produce a receipt or find a clerk who remembered the sale. Thus, defendant's conduct went well beyond "mere negligence." It was willful in that it ignored not only a

person's right to freedom and the legislative limits on a merchant's right to interfere with that freedom but also the failings in its own practices that placed innocent shoppers at risk.

.  A second indicium of an excessive punitive damage award is its ratio to the actual harm inflicted on the plaintiff. *BMW*, 134 L Ed 2d at 829. Defendant argues that the ratio of punitive to compensatory damages here of 18:1 is not justified for this "10 minute incident." *See Haslip*, 499 US at 23 (concluding that punitive damages award more than four times the amount of compensatory damages might be "close to the line"). In effect, defendant contends, the jury awarded plaintiff "$45,000 for each minute of the encounter." However, there is no mathematical formula marking the constitutional line, *id.*, 134 L Ed 2d at 830, and monetary awards cannot be quantified in terms of elapsed time. The Supreme Court made it clear in *BMW* that a higher ratio might be justified if particularly egregious acts result in small compensatory damages or if the monetary value of noneconomic harm is difficult to determine. *Id.*, 134 L Ed 2d at 831. That is the situation here. As plaintiff points out, here defendant chose to ignore legislatively enacted limits on interference with a person's fundamental right to freedom, instead unilaterally giving its employees greater power to stop and detain people than the law allows.

In assessing the ratio of a punitive award to compensatory damages, the proper focus of the inquiry is the reasonable relationship between the award and the harm likely to result from the defendant's conduct, as well as the harm that actually occurred. *Id.*, 134 L Ed 2d at 830. As noted above, here the potential for harm caused by defendant's policy of random stops was great. The ratio of punitive damages to compensatory damages is high. However, when considered in the light of the interest involved and defendant's choice to ignore limits placed on a merchant's right to interfere with that interest, we conclude that the award is reasonably related to the harm. *See Murray v. Laborers Union Local No. 324*, 55 F3d 1445, 1453 (9th Cir 1995) (punitive award 800 times compensatory award not excessive given seriousness of infringement on the plaintiff's freedom of speech).

■ The third guidepost identified in *BMW*— comparable civil and criminal penalties—implicates whether a person has received fair notice of the severity of the penalty that a state may impose. Comparing a punitive damage award to criminal and civil penalties helps to ensure that a defendant has had some notice that reprehensible conduct will result in a severe penalty. *See BMW*, 134 L Ed 2d at 832 (none of the statutes would provide out-of-state distributor with fair notice that the violation might subject an offender to a multi-million dollar penalty); *see also Lee*, 101 F3d at 811 ("When penalties for comparable misconduct are much slighter than a punitive damages award, it may be said that the tortfeasor lacked 'fair notice' that the wrongful conduct could entail a substantial punitive award.").

That guidepost is of limited assistance here where, unlike in *BMW*, there are no legislatively enacted civil sanctions against which to measure the prohibited conduct and criminal offenses have only limited similarity to defendant's conduct. Nonetheless, defendant argues that the punitive damage award here "far exceeds the maximum economic criminal penalties in Oregon for conduct far more egregious" than that shown on the record here. Defendant points out that the criminal offenses of coercion, ORS 163.275(1), and intimidation in the first degree, ORS 166.165, both felonies, carry a maximum fine of $100,000 for individuals and $50,000 for corporations, and that menacing, ORS 163.190, a Class A misdemeanor, carries a fine of $5,000. Plaintiff responds that defendant fails to recognize that coercion has a possible five-year term of incarceration for conviction. Assuming that an incarcerative sanction may fairly be viewed as some notice of a possibly severe punitive damage for a corporate defendant in a somewhat analogous civil action,[5] we agree with plaintiff that a five-year term shows the offense to be serious.

---

[5] The limit of that value is suggested in *VF Corp. v. Wrexham Aviation*, 686 A2d 647, 664 (Md App 1996):

" 'A corporation is an imaginary being. * * * And since these ideal existences can neither be hung, imprisoned, whipped, or put in the stock—since in fact no corrective influence can be brought to bear upon them except that of pecuniary loss—it does seem to us that the doctrine of exemplary damages is more beneficial in its application to them, than in its application to natural persons.' " (Quoting *Goodard v. Grand Trunk Ry.*, 57 Me 202, 223-24 (1869).)

More pertinent to the consideration here is whether a lesser penalty would deter future misconduct. *See BMW*, 134 L Ed 2d at 832 ("The sanction imposed in this case cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal."). In *BMW*, the court concluded that, in the absence of a history of non-compliance with known statutory requirements, there was no basis for assuming that a more modest sanction would not have been sufficient to motivate compliance with the requirement to disclose a material fact. *Id.* In contrast, here, the evidence shows defendant's history of noncompliance with the statutory limits on its right to interfere with personal freedom.

Our consideration of the *BMW* guideposts shows that the circumstances support a substantial punitive damage award. Defendant's conduct was egregious. It not only resulted in plaintiff publicly being perceived as a thief but had the probability that others likewise would be humiliated and embarrassed and, perhaps, be falsely accused of stealing. We conclude that the punitive damage award here does not transgress constitutional limits.

■     Defendant's final assignment of error is that the court erred in denying its motion to strike the punitive damages claim because the evidence was not sufficient for the jury to find the requisite elements of malicious and wanton intentional behavior. The bases for our holding that the amount of punitive damages is sustainable also support the jury's finding that the facts justify any award of punitive damages were present.[6]

Affirmed.

---

[6] We do not address defendant's argument that the words and silence of its store personnel are expressive conduct, precluded by the Oregon Constitution from supporting a punitive damages award. *See Hall v. The May Dept. Stores*, 292 Or 131, 145-47, 637 P2d 126 (1981) (employee seeking recovery for emotional distress on ground that director of security for employer accused her of stealing money and threatened her with prosecution was not entitled to award of punitive damages, because such accusations were speech and expression of opinion even though jury could find that they were tortious in manner). Defendant's argument to the trial court did not alert it to this theory, and the issue is not an error of law apparent on the face of the record.