Argued and submitted March 30, vacated and remanded in part; otherwise affirmed on appeal and cross-appeal September 27, 2000

Nancy J. JENSEN,
*Respondent - Cross-Appellant,*

*v.*

Walter R. MEDLEY,
Sublimity Insurance Company, Local Union No. 49,
and Roofers Building Association
& Charles Ouellette,
*Defendants,*

*and*

THE UNITED UNION OF ROOFERS,
WATERPROOFERS & ALLIED WORKERS,
*Appellant - Cross-Respondent.*

(9410-07258; CA A97720)

11 P3d 678

Stephen Feinberg, Chicago, Illinois, argued the cause for appellant - cross-respondent. With him on the briefs were Marvin Gittler and Asher, Gittler, Greenfield, Cohen & D'Alba, Ltd., Chicago, Illinois. On the opening brief were Janet M. Schroer and Hoffman, Hart & Wagner.

I. Franklin Hunsaker argued the cause for respondent - cross-appellant. With him on the briefs were Bullivant Houser Bailey, Steven V. Rizzo and Seidl & Rizzo.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

Defendant United Union of Roofers, Waterproofers & Allied Workers (International) appeals from a jury verdict in favor of plaintiff Nancy Jensen on a statutory claim under ORS 659.550 (the whistleblower law). International asserts that the trial court made numerous errors: in instructing the jury; in denying International's motion for a directed verdict and judgment notwithstanding the verdict on the question of whether plaintiff was entitled to punitive damages; and in failing to reduce the $1,250,000 punitive damage award. On cross-appeal, plaintiff asserts that the trial court erred in determining the amount of attorney fees to award. As explained below, we conclude that the trial court properly instructed the jury and properly denied International's motions regarding whether plaintiff's claim for punitive damages should go before the jury. We further conclude that the jury's award of punitive damages was excessive, and therefore order a remittitur. We affirm without discussion on cross-appeal.

■ We state the evidence in the light most favorable to the party in whose favor the verdict was returned. *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or 487, 490, 982 P2d 1117 (1999). Plaintiff Jensen began work in June 1993 as a bookkeeper for Local 49 (Local) of the United Union of Roofers, Waterproofers and Allied Workers. She was hired by and worked for Medley, the Local's business agent and financial secretary. Plaintiff maintained an accounting system known as the "McBee" system and was trained by Ziegler, International's vice-president, in the use of its computerized financial software. Plaintiff also handled petty cash.

By the fall of 1993, plaintiff came to believe that there were discrepancies in the books concerning certain payments that had been received by her predecessor. She became concerned that members had been given "unofficial" receipts for payments under the McBee accounting system that were not properly reflected in the "official" computerized accounting system. She believed that certain records of the McBee accounting system were missing. She also had difficulty balancing the petty cash and would occasionally make up small amounts of missing money from her own pocket in

order to make the books balance. She observed Medley taking petty cash on occasion and gambling with it. She discussed the problems with the books with Medley, who did not want her to pursue the matter. She then discussed her concerns with Ziegler. Ziegler was based at International's California office but was often in Portland during the time that plaintiff worked for Medley. Although plaintiff expressed concerns to Ziegler, she was unable to provide him with any documentation that demonstrated that money was missing. Ziegler reported plaintiff's concerns to International's president but took no further action.

On February 7, 1994, plaintiff contacted the United States Department of Labor to report her suspicions about the Local's accounting problems. Plaintiff told Ziegler that she had contacted the Department of Labor, and he responded that he wished she had not done so and that he would have to notify International's president. Shortly after plaintiff made contact with the Department of Labor, the Local's computer malfunctioned, and Ziegler came to Portland to help with the problem. Medley consulted Ziegler about plaintiff's allegations, and Ziegler recommended that an accountant go over the books with plaintiff. Ziegler worked with the Local's accountants to develop procedures for dealing with plaintiff's allegations. Ziegler and Medley arranged for plaintiff to spend a day going over several months' financial records with one of the Local's accountants, Mack. Mack discovered some bookkeeping errors but found that no funds were missing. Medley then called Ziegler and asked him if they could stop reviewing the records at that point. Ziegler agreed.

On March 3, 1994, the Local's executive board met, and Medley reported that there was no money missing and that plaintiff had apologized. Several members of the board wished to terminate plaintiff's employment. Rather than terminate her employment entirely, Medley reduced plaintiff's hours from full-time to two days per week. On March 5, Medley told Ziegler that he wished to terminate plaintiff's employment, and Ziegler suggested that her hours be reduced in order to get her to quit the job. At that time, Ziegler was unaware that Medley already had reduced plaintiff's hours. On March 7, Medley threatened to terminate

plaintiff's employment unless she signed an apology letter stating that all funds were accounted for. Plaintiff signed the letter. On March 11, Medley terminated plaintiff's employment after expressing anger at her for contacting the Department of Labor.

In the months following plaintiff's termination, Medley and members of the Local's executive board made various defamatory statements about plaintiff. After Medley made such statements at a union meeting in June 1994, plaintiff became upset and stayed in her bedroom for several months.

The Department of Labor investigated plaintiff's report but discovered no misappropriation of funds at the Local. Further investigation did reveal some problems in the ways the books were kept, and it eventually was discovered that plaintiff's predecessor had taken some records. Medley was replaced as business agent by Ouellette, who wrote a letter to union members announcing that the union was being sued by plaintiff and that plaintiff had publicly made false accusations of theft.

Plaintiff initiated this action, originally naming as defendants Medley and the Local. She alleged statutory discrimination under the whistleblower law, wrongful discharge, sexual harassment, racketeering, and intentional infliction of emotional distress. Medley settled with plaintiff, and plaintiff dropped the sexual harassment claim. Several other claims were dropped, and the court granted summary judgment for defendants on the racketeering claim. The case was tried on plaintiff's second amended complaint, which added Ouellette and International as defendants, and alleged statutory whistleblower discrimination, wrongful discharge, slander and libel. The court directed a verdict against plaintiff on the wrongful discharge claim. The jury returned a verdict against defendants on plaintiff's whistleblower claim, awarding $35,000 in noneconomic damages and $1,250,000 in punitive damages. The jury further found that Medley had defamed plaintiff and that the Local was liable for that defamation, but that International was not. The jury awarded $100,000 in noneconomic damages on that claim. The jury also found that defendant Ouellette had

defamed plaintiff and that the Local was liable for that defamation, but that International was not. The jury awarded $5,000 in noneconomic damages on that claim.

International moved for a judgment notwithstanding the verdict and for a new trial and sought reduction of the punitive damages. The court reduced the damages by the amount for which Medley had settled and entered judgment against International in the amount of $1,270,000. International appeals from that judgment.

■ International assigns error to the trial court's rejection of its proffered instructions concerning the relationship between International and the Local and further contends that the trial court erred in giving its instruction concerning vicarious liability and agency relationships. Defendant asserts on appeal that the trial court erred in failing to give its proposed instruction number 18:

> "The International's Constitution and Bylaws is a contract between the International and its ninety-six (96) affiliated local labor organizations representing workers in the roofing and waterproofing industry. I instruct you as a matter of law, although the power granted by the International's Constitution which may be exercised by the International Union over Local 49 in some circumstance may be considerable or pervasive, the International's Constitution, and matters contained therein, do not prove that Local 49 or any Local 49 officer or employee was acting for or on behalf of the International Union."

International argues that the proposed instruction would have informed the jury correctly concerning the relationship between the International and the Local. Plaintiff points out in response that International has failed to quote the *remainder* of its requested jury instruction number 18. The proposed jury instruction went on to state:

> "Plaintiff argues that the International retains the right to suspend or remove local officials and take over the conduct of the local union business under a variety of circumstances and that the local union must be organized and operated in the manner outlined in the International Constitution. This ignores the local's substantial autonomy in handling its own affairs. The local is simply not an arm of the International for all purposes."

The court rejected proposed instruction number 18, stating, "I think it would be a comment on the evidence."

█ We do not consider International's argument that the trial court erred in failing to give the first paragraph of its requested instruction. We evaluate the propriety of a proposed jury instruction as a whole. If it would be error to give any part of the proposed instruction, the court does not err in refusing to give the instruction. *Hernandez v. Barbo Machinery Co.*, 327 Or 99, 106, 957 P2d 147 (1998). We agree with the trial court that giving the argumentative second paragraph of the instruction would have constituted a comment on the evidence. "A court impermissibly comments on the evidence when it gives a jury instruction that tells the jury how specific evidence relates to a particular legal issue." *State v. Hayward*, 327 Or 397, 410-11, 963 P2d 667 (1998). The trial court did not err in rejecting International's proposed instruction number 18.

█ International also proposed jury instruction number 19:

> "The International Union cannot be liable for the wrongful acts of Local 49 or any of Local 49 officers or employees absent an agency relationship between the International and Local 49 or the International and any Local 49 officer or employee such as defendant Medley or defendant Ouellette. This agency relationship can be established only if the international instigated, supported, ratified, or encouraged the local's wrongful acts. Knowledge of a local's possibly illegal activities does not impose a duty upon the International to intervene."

The court instead gave the following instruction regarding agency:

> "The International can only be liable for Local 49's act if Local 49 was the agent of the International and acted in the scope of that agency or if the International ratified Local 49's actions. I instruct you a principal is responsible for the acts of an agent who was acting within the scope of the agency. An agent is authorized to act for and is subject to the control or right to control of the principal. An agent acts within the scope of his agency if at the time of commission of the act in question, he was performing a service for the principal in furtherance of the principal's business. The

acts of an agent within the scope of that agent's authority are to be considered by you as the acts of the principal. You must determine if Local 49 was the agent of the International union."

International assigns error to the court's failure to give its requested instruction number 19, as well as to the court's decision to give the agency instruction above. International argues that no Oregon law exists that is on point as to how the jury should have been instructed on an agency relationship between an international and a local union. International suggests that Oregon should adopt the federal test followed in *Carbon Fuel Co. v. United Mine Workers*, 444 US 212, 100 S Ct 410, 62 L Ed 2d 394 (1979), to determine an international union's liability for the acts of a local union under the Labor Management Relations Act (LMRA). In that case, the Court followed legislative history of the Act that indicated that Congress intended that "[t]here must be legal proof of agency in the case of unions as in the case of corporations." 444 US at 217. The test for agency under the LMRA, the Court noted, "replaced the very loose test of responsibility" under the original 1935 National Labor Relations Act, which had included as an employee "any person acting in the interest of an employer[.]" *Id.* In *Carbon Fuel Co.*, a local went on strike, and the employer tried to hold the international union responsible for its losses. Under the international's constitution, the local lacked authority to strike without authorization from the international, and the international had expressly opposed strikes such as the one undertaken by the local. *Id.* at 218. The Court held that, under the circumstances, the international union was not obligated to try to control the local's actions and quoted with approval from the lower court's statement that "[t]here was no evidence presented * * * that either the District or International Union instigated, supported, ratified, or encouraged any of the work stoppages." *Id.*

International contends that, under the rule of law from *Carbon Fuel Co.*, an international union may be held liable for the acts of locals only if there is evidence that it "instigated, supported, ratified or encouraged" the local in its wrongful acts. Plaintiff responds that *Carbon Fuel Co.* did

not establish a blanket rule that adopted the "instigated, supported, ratified or encouraged" standard as the whole of the law of agency as it relates to international and local unions. Rather, plaintiff argues, the federal law of agency adopted by the Court in *Carbon Fuel Co.* is essentially the same as the Oregon common law of agency on which the jury was instructed.

We do not agree with plaintiff that the standard enunciated in *Carbon Fuel Co.* is essentially the same as the standard set forth in the jury instruction that the court gave. Although the instruction given did instruct on ratification, it also instructed that an "agent acts within the scope of his agency if at the time of commission of the act in question, he was performing a service for the principal in furtherance of the principal's business." That standard may, in fact, more resemble the "any person acting in the interest of an employer" standard that Congress rejected in enacting the agency provision of the LMRA at issue in *Carbon Fuel Co.* However, defendant International advances no persuasive reason why Oregon law must, or even should, embody the same test of agency that Congress wished to adopt when it enacted the LMRA. Defendant appears to acknowledge that plaintiff's claims are not governed in any way by federal law.

Under Oregon law, the common law of agency relationships has developed around the "right to control" standard, as set forth in the jury instruction that the trial court gave the jury. Although the test is most often used in an employer-employee agency relationship, it also has been used to determine agency relationships between certain types of business entities. Most notably, it has been applied to franchisor-franchisee relationships and manufacturer/distributor-dealer relationships that are in some ways analogous to the international-local union relationship at issue in this case.

In *Peeples v. Kawasaki Heavy Indus., Ltd.,* 288 Or 143, 145, 603 P2d 765 (1979), the question was whether a motorcycle manufacturer and distributor could be held vicariously liable for negligent services provided under the terms of the dealer's warranty agreement. The agreement between

the manufacturer/distributor and the dealer gave the manufacturer/distributor the power to set standards "governing the dealer's method of operation, service, and warranty repair and its power of immediate termination for the dealer's breach of any of those standards, to control to some degree the physical conduct of the dealer and his employees in the performance of warranty-related service work." *Id.* at 148-49. The court went on to note that it is enough that such rights exist; "the right may not actually have been exercised." *Id.* at 149. The court held that, because the manufacturer/distributor had the right to control the manner in which warranty services were carried out, the question of vicarious liability was properly submitted to the jury. *Id.* at 150.

In *Miller v. McDonald's Corp.*, 150 Or App 274, 945 P2d 1107 (1997), we held that the "right to control" test applied to determine whether an agency relationship existed between a franchisor and a franchisee. Following *Peeples*, we concluded:

"[W]e believe that a jury could find that defendant retained sufficient control over [the franchisee's] daily operations that an actual agency relationship existed. The [franchise] Agreement did not simply set standards that [the franchisee] had to meet. Rather, it required [the franchisee] to use the precise methods that defendant established * * *. Defendant enforced the use of those methods by regularly sending inspectors and by its retained power to cancel the Agreement." *Id.* at 281.

Similarly here, an agreement between International and the Local provides the basis for the working relationship between those entities. Under the terms of International's constitution and bylaws, local unions may come into existence by applying for a charter and being accepted by International. A local's own constitution and bylaws must conform to those of International, and International has the right to revoke a local's charter whenever necessary or advisable, whereas a local may not dissolve if any members dissent as to dissolution. If a charter is revoked or a local dissolved, all property and money of the local become an asset of International. Under its constitution and bylaws, International has a duty to furnish locals with various items including official

receipt books, and locals have a duty to account for all payments received through International's official receipts system; only one system is to be used by the local, and the system may be changed only on approval of International. International's constitution and bylaws set forth in detail how local dues are to be collected and transmitted to International. International requires that those who handle a local's funds be bonded, that locals maintain quarterly and annual audits of their books, and that locals submit reports of those audits on a form furnished by International. Under its constitution and bylaws, International also has the power to impose a trusteeship on a local union to correct financial malpractice, assure performance of collective bargaining agreements, restore democratic procedures, or carry out other legitimate objects of the organization.

We believe that the nature of the relationship between an international and a local union, as exemplified by International's constitution and bylaws described above, is similar enough in nature to an agreement between a franchisor and a franchisee to be subject to the same common-law "right to control" test of agency under Oregon law. The trial court's instruction to the jury, as quoted above, satisfactorily described that common-law test. The trial court did not err in rejecting defendant's proposed instruction based on federal law and did not err in giving an instruction based on the common-law test of agency under Oregon law.

■ In a related assignment of error, International contends that the trial court erred in instructing the jury on vicarious liability in the context of plaintiff's entitlement to punitive damages. The trial court instructed the jury that, if it found an agency relationship between the Local and International and found that punitive damages against the Local were appropriate, it could award punitive damages against International based on the same "right to control" standard as discussed above. International argues only that the court erred in giving this instruction for the same reason it erred in failing to give International's proposed instruction on the "instigated, supported, ratified or encouraged" standard. International argues that the punitive damages instruction "repeated the error of the trial court's 'right to control' agency

test." Thus, as framed by International, its success on this assignment of error is entirely dependent on its success on its previous assignments of error concerning the court's general instruction on agency. Given the way that International has framed its argument, we reject this assignment of error for reasons set forth above.[1]

■ International next argues that the trial court erred in instructing the jury as follows:

> "I instruct you that in the State of Oregon it's [an] unlawful practice for an employer to fire, demote, suspend, or in any manner discriminate or retaliate against an employee with regards to promotion, compensation or other terms, conditions, or privileges of employment for the reason that the employee has in good faith reported criminal activity by any person. The employee is not required to prove that a crime did occur.
>
> "Public policy favors the reporting of apparently criminal activity, and whether the activity may later be proved to have been legitimate or not is not relevant."

International argues that the instruction is erroneous because whether an act reported as criminal by an employee may later prove legitimate may have bearing on whether the employee acted in good faith in making the report. However, the court went on to instruct:

> "Plaintiff must prove that her hours were cut from full time to part time, and/or that she was fired in retaliation for making a good faith report of criminal activity by any person to law enforcement authorities or to [an] administrative agency with the power to investigate the conduct reported, and further that the plaintiff has sustained damages.
>
> "Definition of good faith [i]n the whistleblower statute. To be protected against discharge under the whistleblower statute, the employee must make a [report of] criminal activity in good faith. For the purposes of this statute, *good*

---

[1] In this assignment of error, International makes no argument that either Oregon law or recent case law from the United States Supreme Court concerning the constitutionality of punitive damage awards might require that a jury be instructed differently on when punitive damages may be awarded against a defendant who is vicariously liable for an agent's conduct. We therefore do not address those subjects.

> *faith means that plaintiff, one, acted out of good faith con-*
> *cerning the criminal activity rather than out of malice, spite,*
> *jealousy, or personal gain; two, had reasonable cause in*
> *reporting her employer or supervisor's suspected violation of*
> *criminal law."* (Emphasis added.)

The jury instruction, viewed as a whole, accurately informed the jury about the "good faith" requirement. Whether the report of suspected criminal activity "may *later* be proved to have been legitimate or not" is, indeed, irrelevant to whether an employee had reasonable cause in reporting the suspected violation of the law at the time the report was made. (Emphasis added.) The instruction properly focused the jury's attention on whether plaintiff had the requisite "good faith" at the time she made the report.

■ International next argues that the trial court erred in instructing the jury:

> "[P]laintiff had filed a sexual harassment count in this case. Her requested damages were $500,000 noneconomic and $2,500,000 punitive damages. That claim has been dismissed. The reason it was dismissed is irrelevant to the determination of the issues in this case. Please disregard it."

International contends on appeal that the court erred in stating, "Please disregard it," because the fact that plaintiff had alleged the same amount of damages for the sexual harassment as for her whistleblower claim was relevant. Some background is necessary to provide the context for this instruction. A preliminary jury questionnaire mentioned sexual harassment but, early in the trial, plaintiff dropped her sexual harassment claim as a result of her settlement with Medley. The parties and the court discussed at great length how and what the jury should be told about the sexual harassment claim. Defendants argued, and the trial court agreed, that the fact that plaintiff had alleged the same amount of damages for the sexual harassment and the whistleblower claim was relevant and could be argued to the jury. After one of the witnesses mentioned sexual harassment, the court told the jury:

> "Ladies and gentlemen, near the conclusion of the morning testimony you heard some evidence that there had

been sexual harassment allegations in the case as it started out. And those sexual harassment allegations have been dismissed. I'm instructing you that you should not speculate or guess why those sexual harassment charges were dismissed. They're irrelevant to your determination of whether or not there was a libel or slander in this case and also whether or not there was a whistleblower violation."

After another witness mentioned sexual harassment, the court reiterated: "Sexual harassment is not an issue in this case. There's nothing in it for you to consider in determining whether or not the whistleblower statue has been violated[.]" The parties then agreed to the following stipulation, which the court read to the jury:

> "I instruct you that the plaintiff has previously claimed in this lawsuit that she was sexually harassed by Mr. Medley and was damaged. She alleged that she suffered mental distress and noneconomic damages in the amount of $500,000 due to that harassment. That claim has been deleted from this lawsuit. The reason for its deletion should not be speculated by you. The reason for its deletion is irrelevant to your decision in this case."

International argues that the "please disregard it" language in the final jury instruction on the subject was too broad, because the jury could have thought that the court meant that it should disregard that plaintiff had alleged the same damages for the dismissed claim as for the whistleblower claim, rather than simply disregarding the reason for its dismissal. We disagree. All of the court's instructions made it clear that what was irrelevant, and what was to be disregarded, was the reason for the dismissal. The final instruction to which International takes exception also made that clear. The court stated that "[t]he *reason* it was dismissed is irrelevant to the determination of the issues in this case. Please disregard it." The jury was asked to disregard "the reason" that the claim was dismissed. That instruction does not differ in substance from the instruction to which International stipulated. The trial court did not err in instructing the jury about the dismissal of the sexual harassment claim.

International next contends that the trial court erred in denying its motion for a directed verdict and for judgment notwithstanding the verdict on plaintiff's claim for punitive

damages. ORS 659.121(2) specifically permits recovery of punitive damages for violation of the "whistleblower" law. International argues that plaintiff failed to produce any evidence from which a reasonable jury could conclude that its conduct was wanton or that International ratified any other person's wanton disregard of plaintiff's right. *See generally MacCrone v. Edwards Center, Inc.*, 160 Or App 91, 108, 980 P2d 1156 (1999) (state's interest in allowing punitive damages is to punish willful, wanton or malicious wrongdoing, and to deter others). International emphasizes that plaintiff was unable to prove at trial that anyone, in fact, was embezzling funds from the local. Focusing on the lack of evidence of embezzlement, International argues that "this was a close case on liability at best" and contends that the clear and convincing evidence of "wantonness" required for an award of punitive damages was lacking. We find International's focus on the lack of evidence of embezzlement to be misplaced. The success of plaintiff's whistleblower claim did not depend on whether plaintiff was, in fact, proved correct in her suspicions of embezzlement.

As the jury instruction quoted above stated, plaintiff was required to prove that she was fired, or her hours were reduced, because she made a good faith report of wrongdoing to the Department of Labor. On review of denial of a motion for a directed verdict, we view the evidence in the light most favorable to the nonmoving party. *Staley v. Taylor*, 165 Or App 256, 994 P2d 1220 (2000). Viewed in the light most favorable to plaintiff, the evidence showed that International's Vice-President Ziegler expressed displeasure to plaintiff that she had made the report to the Department of Labor and that, when Medley told Ziegler his wish to terminate plaintiff's employment because of the report, Ziegler suggested cutting plaintiff's hours to make her quit work. Although, unbeknownst to Ziegler, Medley already had cut plaintiff's hours, we conclude that Ziegler's suggestion that plaintiff's hours be cut was evidence that International ratified Medley's retaliation against plaintiff for her report to the Department of Labor.

International also argues that, even if the evidence shows that Medley acted with the requisite wantonness, there was no evidence that International ratified Medley's

conduct "with full knowledge of material facts." Assuming for the sake of argument that plaintiff was required to prove that International ratified Medley's retaliation "with full knowledge of material facts," there is evidence in the record that it did so, *e.g.*, evidence that Ziegler was aware of the nature of plaintiff's concerns, evidence that Ziegler disapproved of her decision to contact the Department of Labor, and evidence that Ziegler suggested that plaintiff's hours be reduced to induce her to quit her job. Plaintiff presented sufficient evidence of wanton disregard of her rights to create a jury question. The trial court did not err in denying International's motion for a directed verdict.

 Finally, International argues that the trial court erred in denying its motion to reduce the punitive damage award on the ground that it was unconstitutionally excessive, in violation of the Due Process Clause of the United States Constitution. It points out that it is a fairly small international union of fewer than 20,000 members and that the punitive damage award amounts to more than 10 percent of its net worth. On review of a claim that a punitive damage award is excessive, we examine "statutory and common law factors that allow an award of punitive damages for the specific kind of claim at issue." *Oberg v. Honda Motors Co.*, 320 Or 544, 549, 888 P2d 8 (1995), *cert den* 517 US 1219 (1996). Plaintiff's "whistleblower" claim is statutory; ORS 659.550 makes it an unlawful employment practice to retaliate against an employee for good faith reporting of suspected criminal activity. The statutory protection provided by the whistleblower statute advances the public policy of encouraging citizens to assist in the enforcement of state and federal laws.

In *Blume v. Fred Meyer, Inc.*, 155 Or App 102, 963 P2d 700 (1998), we applied the factors identified by the Court in *BMW of North America v. Gore*, 517 US 599, 116 S Ct 1589, 134 L Ed 2d 809 (1996), to determine whether an award of punitive damages associated with a false arrest claim was unconstitutionally excessive. Applying *BMW*, we stated:

> "Three 'guideposts' assist in reviewing whether a punitive award has crossed constitutional boundaries: (1) the degree of reprehensibility of the conduct; (2) the disparity

between the harm or potential harm suffered and the punitive damage award; and (3) the difference between the award and the civil or criminal penalties authorized or imposed in comparable cases." 155 Or App at 112.

The first guidepost, the reprehensibility of the conduct at issue, is "perhaps the most important." *Id., citing BMW*, 517 US at 575. The Court has noted three aggravating factors in conjunction with this factor: whether the defendant's conduct was violent or threatened violence; whether the defendant used trickery or deceit as opposed to mere negligence; and whether the defendant has engaged in repeated instances of misconduct. 155 Or App at 115, *citing BMW*, 517 US at 576. International argues that none of the aggravating factors is present in this case with regard to its liability. We agree that this case involved no violence or threats of violence. We also agree that there is no evidence in the record that there were repeated instances of misconduct. Moreover, there was very little trickery or deceit involved: Medley and the executive board were fairly straightforward about their desire to get rid of plaintiff because of her accusations of financial improprieties to the Department of Labor. However, International's Vice-President Ziegler did suggest that, rather than simply firing plaintiff because of her accusations, Medley should reduce her hours to try to make her quit. He thus suggested that Medley engage in deceit and trickery in regard to the retaliation against plaintiff. Accordingly, we conclude that at least some of plaintiff's evidence supports a finding that International's conduct was "reprehensible."

■ Our second guidepost in reviewing the constitutionality of the punitive damage award is the ratio of the punitive damage award as compared to the actual harm to plaintiff as reflected by the compensatory damage award. Plaintiff was awarded $35,000 in noneconomic damages on her statutory whistleblower claim; the punitive damage award of $1,250,000 on that claim is about 35 times the amount of the noneconomic damages. The Court has indicated that a high ratio of punitive to compensatory damages may be justifiable where a defendant's acts are egregious but the monetary value of noneconomic harm is low or difficult to determine. *BMW*, 517 US at 582; *Blume*, 155 Or App at 117. Here, the noneconomic damages were not difficult to determine, nor

were they *de minimis*. In evaluating this factor, we consider not only the harm that actually occurred but the harm likely to occur as a result of defendant's conduct. *Id.* This is not a situation where greater harm than occurred was likely to have occurred; the harm that occurred is exactly the harm that defendant intended—plaintiff lost her job.[2] *Compare Blume*, 155 Or App at 115-16 (practice of randomly detaining shoppers without cause had great potential for harm).

Finally, we look to the nature and amount of criminal or civil penalties that could have been imposed for the conduct at issue. Violation of ORS 659.550 may lead to the imposition of a fine of $1,000 and one years' imprisonment. ORS 659.550; ORS 659.990. Plaintiff argues that defendants "engaged in criminal or apparently criminal" activity and suggests that Medley misapplied entrusted property, falsified records, and tampered with computer records. Plaintiff argues that those activities could have led to sanctions up to a five-year term of imprisonment and a $100,000 fine. The conduct at issue, however, is not the conduct that plaintiff suspected defendants were engaging in that led her to make her report to the Department of Labor. The conduct at issue is defendants' conduct in retaliating against plaintiff for making that report. Plaintiff was not required to prove, and indeed has not proven so far as we are aware, that the suspected criminal activity that she reported led to the imposition of criminal or civil sanctions against any of the defendants. Criminal and civil sanctions that result from the Department of Labor's investigation are not relevant to our inquiry about criminal and civil sanctions for violation of the whistleblower law.

Taking into account these three guideposts, we conclude that the punitive damage award of $1,250,000 for plaintiff's whistleblower claim was excessive. Defendants' conduct was reprehensible in that they retaliated against plaintiff for her report to the Department of Labor, and Ziegler suggested that the retaliation be done in a deceptive

---

[2] We address only the harm involved in plaintiff's whistleblower claim and not the harm that may have resulted from the defamatory statements made about plaintiff by various members of the Local. As noted above, the jury specifically found that the International was not liable to plaintiff on those claims, and, in any event, they did not provide the basis for a claim for punitive damages.

manner. However, no threats of violence were involved, and, as far as this record shows, the reprehensible conduct against plaintiff was an isolated instance and not part of a pattern or practice of misconduct. *Compare Parrott v. Carr Chevrolet, Inc.*, 156 Or App 257, 280, 965 P2d 440 (1998), *rev allowed* 328 Or 418 (1999) (repeated business practices that violated Unlawful Trade Practices Act supported award of $300,000 in punitive damages, with compensatory damages of approximately $11,000); *Blume*, 155 Or App at 115-16, 119 (store practice of randomly detaining shoppers and asking for receipts without probable cause of shoplifting justified punitive damage award 18 times greater than compensatory damage award). The ratio of punitive damages to noneconomic damages in this case is about 35:1; no special circumstances are present in this case that justify an exceptionally high ratio of punitive damages in relation to compensatory damages. Finally, although civil and criminal sanctions are possible for defendants' conduct, we do not believe that the amount of these sanctions is so great as to justify a punitive damage award of $1,250,000.

■ Defendants' conduct in this case was blameworthy; the jury was justified in awarding punitive damages. We conclude, however, that a punitive damage award of $175,000 damages is reasonably related to the harm that occurred in this case. In *Parrott*, we determined that the proper procedure for reducing an award of punitive damages was through remittitur. 156 Or App at 281. Thus, on the punitive damage award, we remand with instructions to enter judgment allowing defendant International's motion for a new trial unless plaintiff files a remittitur of punitive damages in the amount of $175,000.

Judgment of $1,250,000 in punitive damages vacated and remanded with instructions to enter judgment allowing defendant's motion for a new trial unless plaintiff files a remittitur of punitive damages in the amount of $175,000; otherwise affirmed on appeal and cross-appeal.