Argued and submitted November 14, 1997, reversed and remanded with instructions in part; vacated and remanded with instructions in part; affirmed in part
September 30, 1998

## Mark PARROTT,
*Appellant - Cross-Respondent,*

*and*

## Charles FORSHEY,
*Plaintiff,*

*v.*

## CARR CHEVROLET, INC.,
an Oregon corporation,
*Respondent - Cross-Appellant.*

(C93-0873CV; CA A88512)

965 P2d 440

258

Kathryn H. Clarke argued the cause for appellant - cross-respondent. With her on the briefs were Maureen Leonard and Michael C. Baxter.

Barbee B. Lyon argued the cause for respondent - cross-appellant. With him on the briefs was Tonkon, Torp, Galen, Marmaduke & Booth.

Before De Muniz, Presiding Judge, and Deits,* Chief Judge, and Haselton, Judge.

DE MUNIZ, P. J.

---

* Deits, C. J., *vice* Rossman, S. J.

## DE MUNIZ, P. J.

Plaintiff[1] brought this action alleging, *inter alia*, a violation of the Unlawful Trade Practices Act (UTPA), ORS 646.608 *et seq.*,[2] arising from defendant's sale of a used 1983 three-quarter ton Chevrolet Suburban truck[3] to plaintiff. The jury returned a verdict in favor of plaintiff, awarding $11,496 in compensatory damages and $1 million in punitive damages. On defendant's motion for remittitur, the trial court reduced the punitive damage award to $50,000 and entered judgment. Plaintiff appeals the reduction in punitive damages, and defendant cross-appeals the judgment in favor of plaintiff. We reverse on the appeal and affirm on the cross-appeal.

Because the jury returned a verdict in plaintiff's favor, we view the evidence and the inferences that reasonably can be drawn from it in the light most favorable to plaintiff. *Greist v. Phillips*, 322 Or 281, 285, 906 P2d 789 (1995). The Suburban that plaintiff purchased from defendant was a trade-in from Conrad Myers, who brought the truck to defendant on Saturday, December 12, 1992. Defendant sent the Suburban to its budget lot, which displayed a sign advertising "quality checked used cars." The lot has older vehicles with at least 100,000 miles that are sold "as-is." The Suburban was priced at $5,995 and was on defendant's lot for about two weeks before plaintiff came to the lot. Plaintiff, a truck driver and school bus driver, wanted to purchase a three-quarter ton truck. The Suburban had been polished, cleaned and serviced, and the salesman confirmed that it had just been detailed. Plaintiff saw that the air cleaner was missing but was assured it would be replaced. Plaintiff noticed that the engine was painted blue and assumed that it had been replaced; he noticed that the radiator had been replaced and looked new, as did the batteries, tires, and upholstery. He

---

[1] We refer only to Mark Parrott as plaintiff. Plaintiff Charles Forshey was co-signer on the loan for the Suburban. He is not a party to this appeal.

[2] The Unlawful Trade Practices Act has been amended since this action was brought. The amendments have no bearing on this appeal, and we refer to the statutes as they read at the time of trial.

[3] A Suburban apparently is considered a truck. According to defendant's service manager, this one was a "heavy duty" towing and hauling truck.

commented, "It looks like quite a lot of recent work was done on this vehicle," to which the salesman replied, "Yeah."

After considering over a weekend, plaintiff decided to purchase the truck. Defendant gave plaintiff $3,100 for a trade-in on his two vehicles, and plaintiff signed a credit agreement through defendant for the balance. On December 30, plaintiff signed the sales documents to complete the transaction and took the Suburban.

The sales documents included a "Buyer's Guide, a "Buyer's Order," a "Special Disclaimers and Conditions" form and a combined vehicle sales document. All of the documents contained "as-is" clauses disclaiming all warranties. The Buyer's Order included a typewritten section stating that the dealership had not inspected the vehicle and had no knowledge of the vehicle's condition, the accuracy of the odometer or Department of Environmental Quality (DEQ) certification. Plaintiff signed next to the disclaimers. The Order also contained a preprinted section required by federal law regarding the odometer reading. That section stated that the odometer read 100,608 "and to the best of my knowledge * * * it reflects the actual mileage of the vehicle[.]" The Disclaimers form stated that the contracting parties had visually inspected the vehicle and that there were no apparent deficiencies in the installation of emission control devices. When plaintiff pointed out that that provision was inconsistent with the missing air cleaner and refused to continue with the transaction without a written promise to replace the missing part, defendant's finance manager gave plaintiff a "we owe" statement for the air cleaner.

Shortly after the purchase, plaintiff noted that the Suburban was missing all of its DEQ equipment, not just the air cleaner. Through library research, plaintiff learned that the engine had a distributor coil that did not belong to the year and engine he thought that he had bought. Plaintiff later learned that, in fact, the 1983 Suburban had a 1981 engine. Plaintiff noticed that the vehicle identification numbers (VIN) were not on the door, transmission, or glove box. On January 14, plaintiff took the truck to DEQ and learned that it did not have the required DEQ equipment. In fact, it would not have been possible to bring the Suburban into

DEQ compliance because of the difference in age between the vehicle and the engine.

Plaintiff did his own title search and learned through the Department of Motor Vehicles (DMV) that the Suburban had undergone previous damage in California and had a title brand, which indicated that it had been severely damaged, totaled, or salvaged. Plaintiff testified that the truck had been stolen at some previous time in California and stripped of its parts. When plaintiff's insurer learned of the branded title, it would no longer insure the vehicle. Although plaintiff did not know at the time he bought the Suburban that the white lines between the odometer numbers indicated tampering, a mileage discrepancy appeared on the replacement title.

After learning of the missing equipment from DEQ, plaintiff complained to defendant. At various times, defendant's employees told plaintiff that he had bought the car "as-is" and repair was his problem; that the Suburban's engine did not require DEQ equipment; that he should not worry about DEQ because the registration was good for another two years; and that defendant would replace the DEQ equipment and engine with junkyard parts. Negotiations for a replacement vehicle ended when plaintiff and defendant could not agree on a vehicle to trade, and defendant's salesman yelled at plaintiff that the Suburban was unfixable, that defendant would not fix it, and that plaintiff would have to be happy with getting his down payment back or learn to live with it. Defendant told plaintiff that he could not have his trade-ins back because they had been sold, although, in fact, both had not.[4] Plaintiff rejected defendant's offer to refund the $3,100 because he would not be reimbursed for the value of his trade-ins[5] or the loan and insurance fees of $200 to $400.

---

[4] Plaintiff's expert testified that this practice in the industry, called "dehorsing," means that, when a dissatisfied customer wants to unwind the deal, the sales personnel attempt to sell the customer a more expensive car rather than return the trade-in. Defendant disputes that it was "dehorsing" plaintiff, which defendant claims is hiding a customer's car while the customer shops for another. Defendant argues that here the transaction had been consummated as plaintiff had already sold his trade-ins to defendant.

[5] Plaintiff was behind in the payments on one of his trade-ins and had wanted to trade for one vehicle and lower his payments.

In January, plaintiff wrote a letter to and telephoned Wallace Preble, one of defendant's owners and chairman of the board. Defendant's attorney replied by letter "rescinding" the transaction and stating that plaintiff had to bring the vehicle back to defendant by February 5, 1993 "so that we can fully reimburse you for what you paid for the vehicle." Preble testified that the response was intended to "bring [plaintiff] to a negotiating point." Plaintiff phoned the attorney who, plaintiff testified, became argumentative and threatened to sue for possession of the Suburban. When plaintiff demanded 85 percent of any profit that defendant may have made on selling his trade-ins, according to plaintiff's interpretation of the terms of the "Buyer's Guide," the attorney promised to get back to him. The attorney did not call back.

At trial, plaintiff presented evidence from which the jury could have found that defendant knew of the condition of the Suburban when Myers traded it. The only document Myers had presented as proof of ownership was a "Notice of Transaction Submitted." That document had a stamped expiration date of 7-16-92 and an obviously altered handwritten expiration date of 7-16-94. Plaintiff's experts testified that a car dealership would not have accepted the altered document as proof of ownership without confirmation from DMV, and, on the Monday after Myers brought the Suburban to defendant, someone had requested and received a basic vehicle information printout for the Suburban from a DMV field office. Defendant's title clerk acknowledged that only the owner, which at that time was defendant, would be interested in this information. The printout revealed an odometer discrepancy and a branded title, which read "out-of-state damage—CA."

At trial, defendant denied that it had inspected the Suburban when it accepted it in trade. However, in addition to the salesman's confirmation to plaintiff that the truck had been detailed, documents showed that the Suburban had had a rear wheel alignment, detail work, lubrication, and an oil and filter change. Defendant did acknowledge appraising the truck and conceded that even a minimal appraisal inspection would have included a visual inspection of the body, paint, glass, upholstery and carpet, a check of the equipment claimed to be on the vehicle, and a test-drive with particular

attention to steering and brakes. Plaintiff's expert testified that any minimally trained dealership employee would have recognized apparent problems with the Suburban and inspected further. There were plainly visible lines on the odometer, a "red flag" indication of tampering; the driver's door was misaligned, was a different color and had been replaced; the dashboard came from a different vehicle; the VIN had been cut out of the glove box and the door and had been ground off the transmission; the engine was not original; and the truck had been heavily reconditioned. Together with the suspect proof of ownership, the appearance of the truck as a reconstructed vehicle should have alerted the dealership to a possible salvage history.

One of plaintiff's experts testified that he would have expected any dealership to recognize the problems, to suspect a title brand, and to inquire further through DMV for title status. Plaintiff's other expert testified that he did not know how defendant could not know about the branded title, had "no question about" defendant's knowledge that the mileage was not accurate, and that defendant "definitely" knew about the missing DEQ equipment.

Plaintiff also presented evidence that, at the time of purchase, defendant implied to plaintiff that it had title to the Suburban in its possession when, in fact, it only had Myers' expired temporary registration. Defendant's finance manager told plaintiff that defendant could not show him the title or use it as the transfer document because defendant had to protect the prior owner's privacy. In fact, defendant did not have title.

There was also evidence that defendant used incorrect title transfer forms, not only in plaintiff's transactions, but as a regular business practice. When an owner has lost a title, as in this case, the correct DMV form is the "Secure Power of Attorney." Defendant had Myers complete Part A of that form but did not use the rest of the form in the sale to plaintiff. Part B should have been completed by both defendant and plaintiff. In that section, plaintiff could have authorized defendant to verify the odometer accuracy when the replacement title arrived or plaintiff could have chosen to verify the accuracy himself. Part C would have required

defendant, when it received the replacement title, to compare the mileage, and the odometer discrepancy would have voided the power of attorney for purposes of odometer disclosure. Thus, if defendant had used the correct form, plaintiff would have learned at the time of sale that defendant did not have title to the Suburban and could have chosen to see the replacement title or authorize defendant to verify the accuracy of the odometer. When the replacement title revealed the discrepancy, defendant's authority to proceed with the transaction without informing plaintiff would have been voided.

When defendant received the replacement title after the sale to plaintiff, it did not inform plaintiff of the odometer discrepancy or branded title. When it completed the back side of the replacement title to transfer ownership from Myers to defendant, it ignored the odometer reading of 107,497 as of July 1992 on the front and filled in the back with the odometer reading of 100,608 as of December 1992. Defendant's title clerk testified that she never looked at the mileage on the title, that she had never noticed the odometer discrepancy, and that she had not been trained by defendant to do so.[6]

Defendant acknowledged that it never completes Parts B or C of the Secure Power of Attorney form. Although Preble had been in the auto industry for 18 years, was president of multiple franchises and a "hands-on" operation manager, he testified that he had "never heard" of the form. Instead, defendant used the "secure odometer form" that both plaintiff and Myers filled out for their trade-in vehicles. That form has two boxes, one of which provides that the "stated mileage is in excess of mechanical limits," and the other states: "The odometer reading is NOT the actual mileage. WARNING—ODOMETER DISCREPANCY." Although customers signed the "secure odometer form," the two boxes were left unchecked. Defendant's title clerk acknowledged that the form was incomplete but could not explain why it was not filled out. Defendant kept the forms on file.

---

[6] The same "oversight" occurred in the transfer of title to Myers' second trade-in vehicle.

Defendant also claimed ignorance of DMV vehicle transfer requirements. Preble testified that he had "no idea" what is required by DMV in its manual and didn't ensure that his employees were informed of DMV titling requirements: "Title work is taught to us by the DMV in an interactive process, not by a manager looking over someone's shoulder." He declined to identify anyone in the company with sufficient knowledge and authority to be responsible for what happened: "Our management style doesn't cause us to have final authority type of thing. That's not the style of management we have." As to the discrepancy between the odometer statements on the front and back of the replacement title, Preble testified: "We would have been as alarmed as you were, had we paid attention to that fact."

Plaintiff's experts testified that there was no legitimate business reason for a dealership to have customers fill out incomplete secure odometer disclosures in addition to the DMV's Secure Power of Attorney form. They testified that the only reason would be to deny wrongdoing later and hide that the vehicle had been previously damaged. They testified that the dealership could disclaim awareness later of any odometer discrepancy should DMV discover it. Defendant acknowledged that it routinely asked customers to sign blank, undated, or otherwise incomplete forms but denied that the use of incorrect, extra, and incomplete forms was for any wrongful purpose. Preble's explanation of the business practice was that,

> "especially in a case like Conrad Myers, where we have kind of a flimsy document that he's giving us, we may say, 'Hey, we might have trouble with this, so sign a power for that,' because we may have to do something else and use the second power for that. So they're proactively trying to prevent, you know, an inability to go ahead with the transaction or inconveniencing a customer, which everybody gets scolded for."

At trial, defendant denied knowing of defects or having any reason to suspect that the Suburban had defects. Defendant denied it had sought or received the DMV vehicle information showing the branded title and mileage discrepancy. Defendant denied servicing the truck and inspecting the Suburban to an extent that would have called attention

to the defects. However, defendant's used car manager, when asked whether he usually inspected trade-ins, equivocated, "Many times I do. Many times I don't." The employee who accepted the Suburban from Myers and most likely appraised it was also equivocal when asked whether he would have noted the absence of DEQ equipment on the appraisal documents and replied, "Possible, if it was something I noticed. It may be noted. It may not be noted."

Defendant also asserted at first that plaintiff was bound by the "as-is" disclaimers of warranties and had no right to pursue defendant for repairs or reimbursement. However, defendant's representatives conceded they would not hold a customer to the disclaimers for missing DEQ equipment or for an odometer that defendant knew had been tampered with. Preble was also equivocal about whether the "no knowledge/no inspection" clause was always used, infrequently used, or used only when a vehicle really had not been inspected. Defendant's testimony about the extent to which it inspected traded-in used cars was uncertain: there was testimony that trade-ins were inspected using a comprehensive 38-point list and underwent an hour-long inspection process, and there was testimony that the Suburban had not been inspected except for appraisal purposes.

At trial, defendant claimed that it had tried to rescind the sale and always intended to reimburse plaintiff in full but did not succeed because plaintiff refused to cooperate and was "scary." However, when plaintiff had persisted in asking for full reimbursement, the clarification of the reimbursement offer given by defendant's attorney did not include the value of plaintiff's trade-ins. Thus, under defendant's reimbursement plan, plaintiff would have been without a vehicle to drive, without reimbursement for his trade-ins, and without repayment of insurance and loan fees. Defendant also accused plaintiff of rendering the Suburban uninsurable by notifying the insurance company of the branded title. Defendant belittled plaintiff's assertions of harm, suggesting that lack of DEQ equipment was immaterial because the registration was valid for another 18 months and that a car without the VIN was still operable.

Plaintiff's complaint alleged that defendant violated the Unlawful Trade Practices Act, ORS 646.608, by selling the 1983 Suburban:

"1) Falsely claiming it was equipped with proper emission controls;

"2) Falsely representing it had been driven 100,608 miles;

"3) With defaced or missing VIN numbers;

"4) Without disclosing that the emission control equipment had been removed; and

"5) Selling the vehicle without disclosing it had previous out of state damage."

We turn first to defendant's cross-appeal. Defendant makes five assignments of error challenging allegations in plaintiff's complaint. It argues that the trial court erred in denying its motions to strike or withdraw from the jury plaintiff's first, third, fourth, and fifth allegations. At the outset, we reject defendant's several contentions under these assignments that there was no evidence to support the jury's findings that defendant knew of the defects. There was evidence from which the jury could find that it did. *See GPL Treatment, LTD. v. Louisiana-Pacific Corp.*, 133 Or App 633, 637, 894 P2d 470 (1995), *aff'd* 323 Or 116, 914 P2d 682 (1996) (review of challenges to the evidence is to determine whether there is any evidence to support the allegation).

Defendant argues that plaintiff's allegations failed to state a claim under ORS 646.608(1)(t), which provides:

"A person engages in an unlawful practice when in the course of the person's business * * * the person * * *:

"* * * * *

"(t) Concurrent with tender or delivery of any real estate, goods or services fails to disclose any known material defect or material nonconformity."

Defendant argues that subsection (t) does not impose on it the duties that plaintiff alleged that defendant breached.

Plaintiff responds that we should not address defendant's argument. He contends that defendant did not argue

to the trial court the grounds on which it now asserts that plaintiff failed to state a claim under the UTPA. Plaintiff acknowledges that previously we have addressed arguments made for the first time on appeal that a plaintiff has failed to state a claim. *See, e.g., Beckett v. Computer Career Institute, Inc.*, 120 Or App 143, 852 P2d 840 (1993). Plaintiff argues, however, that doing so continues the practice under *former* ORS 16.330 and does not recognize a "fundamental change" wrought by the passage of ORCP 21.[7] Plaintiff argues that, under *former* ORS 16.330, motions challenging jurisdiction were not separate from those asserting a failure to state a claim. Plaintiff argues that now under ORCP 21 those motions are separate and, therefore, although an action still may be dismissed at any time for lack of jurisdiction, the defense of failure to state a claim is waived if not made in a pleading, by motion for judgment on the pleadings, or at trial on the merits. ORCP 21 G(3); ORCP 21 F.

We do not reach plaintiff's arguments. Plaintiff, himself, placed subsection (t) clearly before the trial court at the hearing on defendant's motion to withdraw the allegations from the jury.[8] We therefore do not agree with plaintiff that, under these circumstances, defendant is precluded from making the arguments that it now makes on appeal regarding subsection (t). *See State v. Hitz*, 307 Or 183, 766 P2d 373 (1988). *See also Stull v. Hoke*, 326 Or 72, 76-77, 948 P2d 722 (1997) (Because plaintiff raised and preserved the broader

---

[7] *Former* ORS 16.330 provided, in part:

"If no objection is taken, either by demurrer or answer, the defendant shall be deemed to have waived any objection, save for the objection to the jurisdiction of the court, and the objection that the complaint does not state facts sufficient to constitute a cause of action."

ORCP 21 G(3) provides, in part:

"A defense of failure to state ultimate facts constituting a claim * * * may be made in any pleading permitted or ordered under Rule 13 B or by motion for judgment on the pleadings, or at the trial on the merits."

ORCP 21 G(4) provides:

"If it appears by motion of the parties or otherwise that the court lacks jurisdiction over the subject matter, the court shall dismiss the action."

[8] The court agreed with plaintiff that subsection (t) applied. For example, in regard to the first allegation, the trial court rejected the argument by plaintiff's counsel that subsections (e) and (g) applied but agreed with counsel that subsection (t) did. Plaintiff's counsel made the "[s]ame argument, your Honor," on the third allegation.

legal issue, a specific alternate argument regarding that issue can be raised for the first time on appeal.).

We turn to defendant's argument that, in denying its motions, the trial court "misunderstood" ORS 646.608(1)(t). Defendant argues that the proper interpretation is that subsection (t)

> "is aimed at the deception that occurs when a customer orders one thing but receives something different, and the seller knows it. For example: a customer orders a car like the floor model he sees on display, but the dealer tenders a car that has rust underneath (a material defect), or a different engine (a material nonconformity), and the dealer knows it. Subsection (t) requires the dealer to disclose the defect or nonconformity."

Defendant contends that its interpretation takes into account the words "concurrent with tender or delivery," which necessarily limit the application of the subsection only to the time of delivery. Defendant argues that its interpretation also is consistent with the context of ORS 646.608(1), in which subsections (a) through (u) are concerned with deceptive conduct and the tender or delivery of a product that is materially different from what the consumer bought. Subsection (t), defendant argues, belongs to that "family" of deceptive practices.[9]

In statutory interpretation, we look first at the text in context and then, if necessary, at legislative history. We do not agree with defendant that subsection (t) is limited to "bait and switch" transactions. The text of subsection (t) creates an affirmative duty of disclosure, and the context shows that the legislature has specifically provided for "bait and switch" transactions in ORS 646.608(1)(i), which makes it unlawful

---

[9] Defendant also argues that plaintiff's interpretation of subsection (t) would "essentially" do away with "as-is" sales and "effectively nullify" ORS 72.3160(3)(a), which explicitly permits a dealer to sell "as-is" and "with all faults." Defendant contends that its interpretation, on the other hand, reconciles subsection (t) with ORS 72.3160(3)(a). We do not agree with defendant that ORS 72.3160(3)(a) is a "related statute" that must be reconciled with ORS 646.608(1)(t). The statutes address different legislative concerns. ORS 72.3160(3)(a), which allows "as-is" sales on an appropriate disclaimer, "calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty[.]" ORS 646.608(1)(t) addresses the failure to disclose known material defects.

to advertise goods with intent not to provide them as advertised. We also do not agree that the phrase "concurrent with tender and delivery" can only be read as a temporal limit to the moment of delivery. "Concurrent" encompasses or denotes a broader time frame. *See Webster's Third New Int'l Dictionary*, 472 (unabridged ed 1993) (defining "concurrent" to include "occurring, arising, or operating at the same time often in relationship, conjunction, association or cooperation").

However, any ambiguity in the text is resolved by legislative history. That history demonstrates that the legislature did not intend subsection (t) to apply narrowly to "bait and switch" transactions. Senate Bill 269 added subsections (s) and (t) to the unlawful trade practices in 1977. Paul Romain, Chief Counsel for the Consumer Protection Division of the Department of Justice, who had been involved in the drafting, explained subsection (t) to the House Committee on Business and Consumer Affairs:[10]

> "The area that this paragraph will most likely affect is used automobile sales. It is a good idea to require disclosure of material defects to allow a buyer to purchase something with as much information about that product as possible. The original Bill had, as an unlawful practice, the failure to disclose any defect. We later decided that this was too strong and too unfair a burden to place on the merchant." Minutes, Business and Consumer Affairs Committee, Exhibit A at 2-3, May 11, 1977.

The trial court did not err in denying defendant's motions.[11]

---

[10] Defendant responds that the statement of a witness before a legislative committee is not an acceptable source of legislative history. In the absence of contrary comments from legislators, it may well be indicative of intent. *See, e.g., Zidell Marine Corp. v. West Painting, Inc.*, 322 Or 347, 357-59, 906 P2d 809 (1995) (testimony of lobbyist in support of bill was indicative of legislative intent when not questioned by any member of legislative subcommittee). Defendant does not point to any contrary comments here.

[11] Defendant also argues that plaintiff suffered no ascertainable loss due to the missing VIN. However, ascertainable loss may be proved by any diminution in the value of the product. *See Scott v. Western Int. Sales, Inc.*, 267 Or 512, 516, 517 P2d 661 (1973) (plaintiff did not have to prove amount of reduction in value of tent because it was not as represented; he merely had to prove he suffered some loss). Here, there was evidence that the missing and defaced VIN indicated that the vehicle had been reconstructed. One expert testified that if he had taken the vehicle in trade and then discovered VIN problems, he would be forced to sell the vehicle as salvage. Another testified that the condition of the VIN is an alert about a branded

Defendant also contends that plaintiff's allegation that defendant violated the UTPA by selling the vehicle "[w]illfully, falsely representing it had been driven 100,608 miles" fails to state a claim under the UTPA because the UTPA does not allow claims for odometer violations. Defendant acknowledges that its argument "apparently was overlooked during trial." Plaintiff again contends that we should not address defendant's arguments of failure to state a claim. However, assuming that defendant can raise the issue for the first time on appeal, we reject its position. ORS 646.638(8) provides that actions by private parties do "not apply to any method, act or practice described in ORS 646.608(1)(w)." That subsection refers to statutes that address specific conduct involving odometer violations.[12] As alleged by plaintiff here, defendant's conduct did not come within the odometer violations exempted by ORS 646.638(8).[13]

■ Defendant also assigns error to the denial of its motion to withdraw the punitive damages issue from the jury and its post-verdict motion to eliminate the punitive damage award. Defendant argues that there was no evidence to justify a finding that defendant's behavior constituted wanton misconduct or a particularly aggravated, deliberate disregard of plaintiff's rights.

The trial court noted that the record supported what was "an extraordinarily egregious violation" of the UTPA. We agree with that determination. There was evidence from which the jury could have found that defendant knew of the extensive defects of the Suburban and of its branded title and odometer discrepancy, and that it concealed those facts from

---

title and that the marketability of a vehicle with a branded title was "extremely slim." The evidence demonstrates ascertainable loss.

[12] Those sections are: making a false application for a vehicle registration, ORS 803.375; falsely swearing to a fact in registering a vehicle, ORS 803.385; selling a device that causes a false odometer reading, ORS 815.410; repairing an odometer without meeting the requirements of law, ORS 815.415; removing an odometer repair notice, ORS 815.420; failing to submit an odometer disclosure to DMV, ORS 815.425; and knowingly submitting false information on an odometer disclosure, ORS 815.430.

[13] Defendant also argues that the jury could not find for plaintiff on the odometer allegation because the jury rejected that defendant had actual knowledge of the odometer problem in plaintiff's claim for fraud. Under the instructions given, the jury was not precluded from finding for plaintiff on the odometer allegation in the UTPA claim while rejecting the claim for fraud.

plaintiff. There was evidence from which the jury could have concluded that defendant's treatment of plaintiff was not an isolated incident in that it had established business procedures that it could employ to cover any failure to disclose. There was evidence that defendant also used abusive tactics to cover its deceptions. Furthermore, from the evasive, inconsistent, and implausible explanations given by defendant's representatives as to defendant's business practices, the jury could infer that defendant had no intention of altering its practices in the future.

Defendant's remaining assignments of error do not require discussion. Because of our decision, we need not discuss plaintiff's cross-assignments of error on defendant's cross-appeal.

We turn to plaintiff's appeal. Plaintiff assigns error to the trial court's reduction of the jury's $1 million punitive damage award. Plaintiff first argues that defendant is bound by its stipulation that it could pay punitive damages up to $3 million. That stipulation resulted after plaintiff filed a request for production seeking defendant's corporate federal and state income tax returns and a certified balance sheet for the years 1991-93. In exchange for not producing that information, defendant stipulated to payment of punitive damages.[14] At trial, relying on the stipulation, defendant resisted plaintiff's attempts to present evidence of defendant's financial worth, and plaintiff's request to tell the jury of the stipulation was denied.

■■ Plaintiff argues that defendant and the courts are bound by defendant's stipulation, *Allstate Ins. Co. v. Stone*, 319 Or 275, 876 P2d 313 (1994); *Norris and Norris*, 302 Or

---

[14] Before trial, defendant's counsel stated:

"[W]e stipulate that we will be responsible for any punitive damages award."

And the court summarized:

"But the stipulation is going to be or has been that because they didn't afford [plaintiff] financial documents, you are—you are assured that [defendant] will pay punitive damages, if awarded."

At trial, defendant's counsel reiterated that,

"in lieu of providing financial information that [defendant] would stipulate that it would be able to meet any punitive damage award and counsel agreed to that in lieu of getting financial information."

123, 727 P2d 115 (1986), and that defendant cannot raise a post-trial challenge to the effects of its stipulation on the evidence presented at trial. *See State v. Bennett*, 17 Or App 197, 521 P2d 31 (1974) (in motion for new trial, defendant could not challenge stipulated testimony; effect of such stipulation is express waiver of any objection). However, a punitive damage award is subject to post-verdict judicial review under the Due Process Clause of the Fourteenth Amendment. *Honda Motor Co. v. Oberg*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994). Defendant's stipulation may well have affected the jury's consideration of the punitive damage award,[15] but it does not preclude defendant's right to challenge the award as unconstitutionally excessive.

Plaintiff argues that the standard of review to apply in evaluating whether a punitive award has transgressed constitutional limits is the standard articulated by the Oregon Supreme Court on remand in *Oberg v. Honda Motor Co.*, 320 Or 544, 888 P2d 562 (1995), *cert den* 116 S Ct 1847 (1996),[16] and that the trial court here erred in reducing the award. Defendant argues that the *Oberg* standard is no longer applicable in the light of *BMW of North America, Inc. v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996). Plaintiff responds that *BMW* did not alter the limited role of the reviewing court under *Oberg*.

We held contrary to plaintiff's position in *Blume v. Fred Meyer, Inc.*, 155 Or App 102, 113, 963 P2d 700 (1998):

---

[15] After trial, the trial court commented:

"I'll be blunt with you. This jury didn't have enough information to do what they needed to do. And a large part of that was because of this stipulation, which was a bad stipulation."

[16] In *Oberg,* 320 Or at 549, the court stated that the

"standard for post-verdict judicial review of an award of punitive damages is as follows: A jury's award of punitive damages shall not be disturbed when it is within the range that a rational juror would be entitled to award in the light of the record as a whole; the range that a rational juror would be entitled to award depends, in turn, on the statutory and common law factors that allow an award of punitive damages for the specific kind of claim at issue." (Footnote omitted.)

That standard was incorporated in ORS 18.535 to ORS 18.540, which address the pleading, proof, and review of punitive damages, including reducing an award if the defendant has taken remedial measures. Those statutes apply to actions commenced on or after September 9, 1995, Or Laws 1995, ch 688, § 5, and do not apply to this case. There is no issue here as to the effect of *BMW* on those provisions.

"[A] reviewing court's determination of whether the punitive damage award is unconstitutionally excessive is not dependent on instructions to the jury or on the jury's considerations. Under *BMW*, although the reviewing court accepts the facts and inferences as the jury found them, evaluating whether a punitive damage award is excessive requires examination of, but not deference to, the jury's award." (Footnote omitted.)

Under *BMW*, the starting point for examination of a punitive damage award is identification of the state's interests that a punitive award is designed to serve. *BMW*, 134 L ED 2d at 822. Underlying the inquiry are elementary notions of fairness: that persons must receive fair notice of the conduct that will subject them to punishment and also of the severity of the penalty the state may impose. *Id.* at 826. The United States Supreme Court articulated three "guideposts" to assist in evaluating whether the award exceeds constitutional limits: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential harm suffered and the punitive damage award; and (3) the difference between the award and the civil or criminal penalties authorized or imposed in comparable cases. *Id.* Although those guideposts are not exclusive, other considerations must be grounded in clear legal principles or historical or community-based standards. *See id.* at 839 (Breyer, J., concurring).

Here, the state interest served by a punitive damage award is protection of the consumer. *See Hinds v. Paul's Auto Werkstatt, Inc.*, 107 Or App 63, 67, 810 P2d 874, *rev den* 311 Or 643 (1991) ("The purpose of the UTPA is to protect consumers from certain acts."). The jury determined that defendant had engaged in conduct prohibited by the legislature.[17] Whether the jury's assessment of the penalty defendant

---

[17] As the trial court stated:

"Did [defendant] violate the law? And the jury found that [defendant] violated it badly, that they—as far as I'm concerned, this jury found that [defendant] intentionally took advantage of [plaintiff] in a very blatant sort of way. If nothing else, that's what the million dollar award tells us. This jury was very, very offended by what [defendant] did. So there is nothing—this jury and this record doesn't [*sic*] allow us to say anything good about [defendant]."

should pay for that conduct exceeded constitutional boundaries requires us to consider, first, the degree of reprehensibility of that conduct, perhaps the most important consideration. *BMW*, 134 L Ed 2d at 826. Three aggravating factors associated with particularly reprehensible conduct are (1) whether defendant's conduct was violent or threatened violence; (2) whether defendant acted with trickery or deceit as opposed to mere negligence; and (3) whether defendant has engaged in repeated instances of misconduct. *Id.* at 827-29.

■ Although defendant's actions toward plaintiff were rude and evasive, there was no violence or threat of violence. However, the other considerations showing particularly reprehensible conduct were present and excessive. Defendant's deliberate manipulation of documents shows trickery and deceit and belies any inference that the transaction with plaintiff was either "mere negligence" or an isolated incident: Although defendant did not have title to the Suburban, it nonetheless implied that it did, telling plaintiff that the title could not be shown to him in order to protect the former owner's privacy. Defendant acknowledged that it never completed the DMV forms that would have alerted customers to defects. Customers signed blank or incomplete forms that defendant kept on file, enabling defendant to disclaim awareness of discrepancies. Defendant's title clerk testified that she never looked at the mileage on the title in plaintiff's transaction and never noticed the odometer discrepancy but that she was not trained to do so. In short, defendant's business practices were established and demonstrate that defendant's misconduct was not restricted to the sale of the Suburban but was part of defendant's day-to-day dealings. The record supports the trial court's conclusion that defendant "blew the Unlawful Trade Practices Act out of the water" by conduct that was "extraordinarily egregious." The extent of defendant's willful violation of the legislative protections for Oregon consumers does not demonstrate that the punitive award here exceeded constitutional limits.

■ However, a defendant's conduct is not the only factor in assessing the constitutionality of a punitive award. Turning to the second guidepost—the ratio of the punitive to compensatory damages—defendant argues that the 87 to 1 ratio

of punitive damages to the actual harm here is 20 times greater than the 4 to 1 ratio that the Court found was "close to the line" in *Pacific Mutual Life Insurance Co. v. Haslip*, 499 US 1, 111 S Ct 1032, 113 L Ed 2d 1 (1991). Plaintiff responds that the Court has refused to draw a mathematical bright line when comparing awards. *BMW*, 134 L Ed 2d at 831.

In *BMW*, the Supreme Court recognized that

> "low awards of compensatory damages may properly support a higher ratio than high compensatory awards if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect[.]" *Id*. at 831.

Here, a particularly egregious act resulted in small economic damages. Nonetheless, a ratio of the size here does "surely 'raise a suspicious judicial eyebrow.' " *Id*. (quoting *TXO Production Corp. v. Alliance Resources Corp*., 509 US 443, 481, 113 S Ct 2711, 125 L Ed 2d 366 (1993) (O'Connor, J., dissenting)). When we consider that ratio in conjunction with the sanctions for comparable misconduct—the third guidepost— we conclude that the $1 million award here exceeds constitutional bounds.

Plaintiff argues that, among the penalties provided by the legislature for violation of the UTPA is forfeiture of a business license. ORS 646.646. That statute provides notice that violations can carry ruinous consequences. However, under ORS 646.646, forfeiture can occur only if there is a violation of an injunction that has issued pursuant to ORS 646.632, restraining a person from engaging in an unlawful trade practice. Before that injunction issues, the alleged violator has an opportunity to enter into an assurance of voluntary compliance, which may include a promise to make restitution, and which insures cessation of the alleged unlawful practice. ORS 646.632(2), (3). Moreover, violation of an injunction does not necessarily result in a loss of a business license. Instead, a civil penalty of not more than $25,000 per violation may be imposed. ORS 646.642. In other words, the legislature has provided for sanctions less severe than losing

a business license in order to enforce compliance with the mandates of the UTPA.

The legislative scheme thus gives notice of increasingly punitive measures for violation of the UTPA. Keeping in mind that a person should have some notice not only of the prohibited conduct but also the possible sanction, we cannot say that the penalty provisions in the UTPA provide notice to defendant that a violation of the UTPA could result in a sanction of the size the jury awarded here. *See BMW*, 134 L Ed 2d at 832 (a sanction of the magnitude in *BMW* cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could achieve that goal).

The question thus becomes, given the facts and circumstances in the record, what award will accomplish the legitimate state interest in punishing defendant and deterring its future misconduct. We do not agree that the amount ordered by the trial court here will accomplish that purpose. The award must bear a reasonable relationship not only to the harm that has occurred but also to the harm likely to result from defendant's conduct. *See id.* at 830. The focus of the inquiry necessarily turns again to the reprehensibility of defendant's conduct.

In *Blume*, we upheld a punitive damage award of $450,000 when the compensatory damages were $25,000—a ratio of 18 to 1. There, the plaintiff had been stopped in the defendant's store and her bag searched for receipts. The defendant had no probable cause to believe the plaintiff was stealing and had stopped the plaintiff pursuant to its policy of randomly checking customers for receipts. We noted that the injury went beyond economic harm in interfering with the plaintiff's fundamental interest in personal freedom, 155 Or App at 117, and that the defendant's policy could result in innocent persons being unfairly accused of theft. *Id.* at 119.

Here, the injury did not touch a fundamental right; it was solely economic. *See BMW*, 134 L Ed 2d at 827 ("The harm BMW inflicted on Dr. Gore was purely economic in nature."). However, the Supreme Court has recognized that

"infliction of economic injury, especially when done intentionally through affirmative acts of misconduct * * * or when the target is financially vulnerable, can warrant a substantial penalty." *Id.*

Here, plaintiff's financial condition bears no resemblance to the affluent doctor plaintiff of *BMW*: Instead of purchasing a black BMW sports sedan for $40,750.88, *id.* at 819, plaintiff purchased a car for $5,995 from the budget lot where older vehicles with high mileage are sold. Plaintiff was behind in payments on one of his trade-ins and turned in two cars to finance $3,100 of the purchase price, signing a credit agreement to pay the remainder. However, we do not conclude that plaintiff was a financially vulnerable target.

In *Life Ins. Co. of Georgia v. Johnson*, 701 So 2d 524 (Ala 1997), on remand from the United States Supreme Court in light of *BMW*, the Alabama Supreme Court reconsidered a $15 million punitive damage award when the compensatory damages were $25,000. The insurance company had sold an illegal Medicare supplement policy to Johnson, who was on Medicaid. The premiums represented almost one-third of her fixed income. *Id.* at 526. The court reduced the punitive damage award to $3 million, *id.* at 531, but noted that the plaintiff had proved that the sale was not an isolated incident and that the conduct of the insurance company had "consciously disregarded the rights of old, indigent, and uneducated citizens of Alabama," *id.* at 529, placing a "sizable group of Alabama citizens * * * at risk[.]" *Id.* at 530.

In *Johnson*, there was clearly a "financially vulnerable" target: The insurance agent, who was in Johnson's home collecting premiums on existing policies and certainly aware of Johnson's lack of financial resources and education, "recommended" that Johnson purchase the worthless Medicare supplement policy. *Johnson*, 701 So 2d at 526. Here, although plaintiff's financial situation may have limited where he would shop, he took affirmative steps to do business at defendant's "budget lot," where used cars were offered for sale to the general public.

However, defendant did inflict economic injury "intentionally through acts of misconduct," *BMW*, 134 L Ed 2d at 827, and we conclude that the record shows that only a

sizable award will serve the state's interest in deterring that misconduct in the future. Important to our conclusion is the legislature's decision specifically to provide for private enforcement of the UTPA through punitive, as well as compensatory, damages. ORS 646.638 ("The court or the jury, as the case may be, may award punitive damages[.]"). As the trial court commented, defendant's conduct here, which was part of its pattern of business, "blew" the UTPA "out of the water." The potential threat of harm reaches well beyond the economic damage suffered by plaintiff,[18] and the record lacks any evidence that defendant has any intention of changing its way of doing business. See BMW, 134 L Ed 2d at 829 n 31 ("Before the verdict in this case, BMW had changed its policy with respect to Alabama and two other States. Five days after the jury award, BMW altered its nationwide policy to one of full disclosure."). Here, defendant either refused to acknowledge its practices or sought to justify them as acceptable "hands-off" management policy. We conclude that the trial court erred in reducing the punitive award to $50,000 and that a punitive award of $300,000 is reasonably related to the harm that occurred and is likely to occur.

 We acknowledge that we make that determination on a record lacking evidence[19] as to whether the award approximates the severest UTPA sanction that could be imposed, that of losing a license. However, defendant had the advantage—which was apparently worth risking $3 million—of

---

[18] We do not agree with defendant that analysis of the harm is restricted to that suffered by plaintiff. See BMW, 134 L Ed 2d at 830 ("[T]here is no suggestion that Dr. Gore or any other BMW purchaser was threatened with any additional potential harm by BMW's nondisclosure." (Emphasis added.)).

[19] With its motion for remittitur, defendant filed affidavits stating defendant's purported corporate worth. Plaintiff objected to that evidence and filed his counsel's affidavit with an attached copy of a business directory listing defendant's annual sales and number of employees. On appeal, plaintiff argues that defendant should have been prohibited from presenting post-trial evidence contradicting its stipulation that it would pay punitive damages of up to $3 million. See Morey, Adminstratix v. Redifer et al, 204 Or 194, 214, 264 P2d 418, 282 P2d 1062 (1955) (party stipulating to concrete fact cannot have benefit of other evidence tending to falsify it). See also Hicks v. Lilly Enterprises, 45 Or App 211, 217, 608 P2d 186 (1980) ("A defendant which presents no evidence of its financial worth cannot complain the jury did not have such evidence."). Defendant contends that the trial court did not consider facts that were not in the record. Although it is not entirely clear whether the court took into consideration facts not in the record, we do not do so.

keeping evidence of its financial circumstances from the jury. Although defendant's stipulation did not preclude its challenge to the amount of the punitive award, any detriment to defendant in assessing that award—either by the jury or the reviewing court—is a consequence of defendant's own making.[20] Moreover, although the wealth of a defendant is a relevant inquiry on the issue of punitive damages, it is not a necessary element, *Hicks v. Lilly Enterprises*, 45 Or App 211, 217, 608 P2d 186 (1979), and whether a defendant is financially able to pay an award does not mandate that it should do so. *See BMW of North America, Inc. v. Gore*, 701 So 2d 507, 514 (Ala 1997) ("[W]here a defendant has not committed an act that would warrant a large punitive damages award, such an award should not be upheld upon judicial review merely because the defendant has the ability to pay it."). Here, it is the egregious degree of defendant's conduct and unwillingness to change that mandates a heavy sanction.

█ In setting the punitive damage award, we do so as a remittitur. The trial court reduced the award. However, in light of the United States Supreme Court's emphasis on the historical underpinnings of the review of punitive awards, *see Honda Motor Co.*, 129 L Ed 2d at 343-46, and Oregon's recognition of remittitur before amendment of Article VII, section 3, of the Oregon Constitution, we conclude that remittitur is available and is the appropriate remedy here. *See, e.g., Adcock v. Oregon Railroad Co.*, 45 Or 173, 179, 77 P 78 (1904) ("The power of the court to require the entry of a remittitur * * * as a condition to overruling a motion for a new trial, has sometimes been denied, but according to the weight of authority the power exists[.]" *See also* 13 Or L Rev 54, 55 (1933) ("A remittitur consists in the court overruling the motion of the defendant for a new trial on condition that the plaintiff will remit a certain portion of the damages.").[21] Accordingly, the judgment on plaintiff's action is affirmed on

---

[20] The trial court correctly noted:

"At one level, as I said previously, [defendant's counsel] is being hoisted by his own petard. He's the one that came up with this rather unusual stipulation and he's the one who carried it out."

[21] ORS 18.537, which does not apply to this case, authorizes a court to reduce a punitive award. *See* note 16.

the condition that plaintiff file a remittitur reducing plaintiff's punitive damage award to $300,000.

■ Plaintiff next assigns error to the court's award of attorney fees, which are authorized under the UTPA. ORS 646.638(3). The trial court here exercised its discretion under the statute to award fees but rejected plaintiff's request for $55,468.75, awarding, instead, a fee of $15,000. Plaintiff argues that the record does not support that award.[22]

■ The amount of attorney fees is a question of fact as to which the trial court has wide discretion. *Creditors Protective Assoc. v. Britt*, 58 Or App 230, 235, 648 P2d 414 (1982). A determination of fees will be set aside only if it is not supported by substantial evidence. *Northwest Acceptance Corp. v. Bles Studs, Inc.*, 105 Or App 54, 60, 803 P2d 775 (1990), *rev den* 311 Or 432 (1991). Here, the trial court found that plaintiff's counsel was responsible for making what "should have been an easy, relatively simple, two-day trial" into "a very difficult six- or seven-day" trial. The court compared attorney fees in murder cases, rape cases, sex abuse cases and theft cases, in which the attorney was paid the statutory $55 an hour, and concluded that "the highest award that would be permitted" was $15,000.

We hold that the trial court abused its discretion in setting the attorney fee award. This was not a criminal defense case. Under the UTPA, attorney fees are authorized to assure

"that wronged consumers can obtain counsel to prosecute claims that otherwise might be impractical to pursue because such claims would require an expenditure of attorney time the value of which greatly exceeded the value of the goods or services in question. * * * The availability of basic compensation to counsel * * * cannot be problematical

---

[22] ORS 20.075, enacted by the 1995 legislature, lists factors that a court must consider in deciding whether to award attorney fees pursuant to a statute. However, the legislature specifically provided that ORS 20.075 does not apply to actions commenced before the effective date of the act. Or Laws 1995, ch 618, § 140. That date was September 9, 1995, after this action was commenced and after judgment was entered. Neither party makes any argument that the statute has any relevance here or that the court's findings are insufficient for purposes of our review. *See McCarty v. Oregon Freeze Dry, Inc.*, 327 Or 185, 957 P2d 1200 (1998) (discussing application of ORS 20.075 to review of court's decision to award or deny fees).

if consumers are going to be able to bring UTPA actions against dishonest and unscrupulous merchants." *Honeywell v. Sterling Furniture Co.*, 310 Or 206, 213, 797 P2d 1019 (1990).

Defendant presented no evidence as to the reasonableness of plaintiff's attorney fees. Plaintiff documented 443.75 hours at $125 an hour and presented expert verification that the hourly amount was reasonable.[23] Defendant had demanded arbitration and throughout the litigation had refused to cooperate. Plaintiff was required to file seven requests for production, which generated two motions and hearings to compel production. Defendant obtained a setover of the proceedings, postponed the trial once, and sought to postpone it a second time. After a year-and-a-half of litigation, defendant moved to join Forshey as an indispensable party and, a month later, moved to file a third-party complaint against Myers. When the trial court allowed the motion but severed the third-party action from the underlying trial, defendant never attempted to serve Myers.

Given the risk involved in this contingency fee case, *see Griffin v. Tri-Met*, 112 Or App 575, 584, 831 P2d 42 (1992), *aff'd in part, rev'd in part on other grounds* 318 Or 500 (1994) (counsel who successfully undertake cases for a contingency fee are generally compensated at rates exceeding standard billing rates for general legal services), defendant's role in delaying a timely resolution, *see Willamette Prod. Credit v. Borg-Warner Acceptance*, 75 Or App 154, 158, 706 P2d 577 (1985), *rev den* 300 Or 477 (1996) (expenditure of attorney time was in large part in response to defendant's defensive tactics and minimal cooperation regarding discovery), and the "prevailing market rates in the relevant community," *see Blum v. Stenson*, 465 US 886, 895, 896 n 11, 104 S Ct 1541, 79 L Ed 2d 891 (1984) (proper comparison is to prevailing market rates in relevant community), we conclude that an award of the requested $55,468.75 is appropriate.

Judgment for attorney fees reversed and remanded with instructions to enter an award of attorney fees in the amount of $55,468.75. Judgment for punitive damages in the

---

[23] Defendant does not contend that the issues could be separated so that an allocation of time by claim was possible.

amount of $50,000 vacated and remanded with instructions to enter judgment allowing defendant's motion for new trial unless plaintiff files a remittitur of punitive damages in the amount of $300,000 within 28 days of the appellate judgment; judgment for compensatory damages affirmed.